WILLIAM E. MEYER,

*Plaintiff in Error,*

vs.

BERNICE O. CULLEY,

*Defendant in Error.*

(No. 2516; 241 Pac. (2) 87; February 26th, 1952)

For the plaintiff in error the cause was submitted upon the brief and also oral argument of Fred W. Layman of Casper, Wyoming, and F. Nelson Pabst of Denver, Colorado.

For the defendant in error the cause was submitted upon the brief and also oral argument of Edward E. Murane and R. R. Bostwick, both of Casper, Wyoming.

## OPINION

RINER, Justice.

Mrs. Bernice O. Culley, as plaintiff, brought an action in the District Court of Natrona County against W. C. Hopkins, d/b/a Rental Service Company and William E. Meyer as defendants. She sought to recover damages for personal injuries suffered by her in an automobile accident which happened on the afternoon of October 24th 1949 in the vicinity of the town of Moneta, Wyoming. This cause is before us by proceedings in error.

The amended petition of plaintiff is in substance as follows: It states in its paragraph " (1) " that the action is against "the defendants and each of them" and thereupon alleges that "W. C. Hopkins is an individual doing business under the trade name of Rental Service Company", and the "defendant William E. Meyer is an individual and employee of said W. C. Hopkins"; in its paragraph numbered " (2) " that the "event out of which this cause of action arose took place on Highway U.S. No. 20 about three miles west of the town of Moneta in Fremont County, Wyoming, on the afternoon of October 24, 1949," where a 1949 Plymouth was upset which was owned by the "defendant Rental Service Company and driven by defendant William E. Meyer." In its paragraph numbered " (3) " it is stated that when the accident aforesaid happened "plaintiff was riding in said automobile as a passenger at the request of the defendant William E. Meyer." The paragraph of plain-

tiff's pleading numbered "(4)" alleges that when the accident happened "defendant William E. Meyer was enroute from Casper, Wyoming, to Worland, Wyoming, on business of the defendant Rental Service Company." The paragraphs of said pleading numbered "(5)" and "(6)" of said amended petition are verbatim as follows:

"(5) That defendant William E. Meyer operated and propelled said vehicle at an excessive rate of speed, to-wit 87 miles per hour, and in such manner as to deliberately frighten plaintiff and without regard to the personal safety of the plaintiff, and further without regard to the remonstrances of plaintiff as to the rate of speed and manner of driving of said defendant; that said auto went off the road surface twice before finally going off the road into the barrow pit and rolling over three times in a distance of 270 feet, all of which was while defendant, William E. Meyer, was under the influence of intoxicating liquor.

"(6) That defendant, William E. Meyer, operated said vehicle as aforesaid in a grossly negligent manner, and that said operation was wilful and wanton misconduct, and that such gross negligence and wilful and wanton misconduct was the sole and proximate cause of said accident."

The remaining three paragraphs of the amended petition undertake to describe plaintiff's injuries and the damage she has suffered in consequence of such accident.

The answer filed by defendant was in these words, omitting the prayer thereof:

"COMES NOW the defendants in the above entitled cause and for their answer pleas as follows to wit:

"1. Admit the allegations set out in paragraphs 1, 2 and 4 and deny the remaining allegations set out in said petition."

The prayer of the defendants was that plaintiff take nothing by "her suit" and defendants be awarded their costs.

Plaintiff demanded a jury trial and the cause was so tried, another judge sitting in the place of the usual presiding district judge of Natrona County.

At the conclusion of plaintiff's evidence defendants moved for a directed verdict on the grounds that:

"* * * the evidence of the plaintiff is insufficient to show negligence—gross negligence, or wilful and wanton misconduct."

Defendants also moved, after both parties had concluded the introduction of evidence, for a directed verdict in their favor "upon the ground and for the reason that plaintiff has not submitted proof sufficient to entitle her to a judgment." Both of these motions were denied by the Court.

Thereafter and on July 17, 1950, the jury returned its verdict finding the issues generally for the plaintiff and assessing substantial damages in her favor.

The following day the defendants filed a joint motion for judgment in their favor notwithstanding the verdict of the jury for the alleged reason that said verdict "is contrary to the evidence and is not supported by the evidence." This motion was on the next ensuing day denied and the judgment as hereinbelow indicated was rendered and entered, to which defendants were given their exceptions.

July 25, 1950, the defendants filed their joint motion for a new trial of the cause on two grounds, viz: 1. That the "verdict is not supported by sufficient evidence and is contrary to the evidence" and 2. "that the damages awarded by the jury is excessive appearing to have been given under the influence of passion or prejudice."

Disposing of this motion for a new trial the court on January 29, 1951 made the following order:

"* * * The Court being fully advised in the premises FINDS as follows:

"1. That the Motion of defendant William E. Meyer should be denied.

"2. That Motion of defendant W. C. Hopkins d/b/a a Rental Service Company, should be granted.

WHEREFORE IT IS HEREBY ORDERED:

"That the Motion of defendant William E. Meyer be and the same is hereby denied, to which defendant William E. Meyer excepts and his exception is allowed.

"IT IS HEREBY FURTHER ORDERED that the motion of defendant W. C. Hopkins, doing business as Rental Service Company, be and the same is hereby granted, to which the plaintiff Bernice Culley excepts and her exception is allowed."

It is apparent from what has been recited and from the evidence presently to be set forth that section 60-1201 W. C. S. 1945 is involved, that section being commonly known as the "Wyoming Automobile Guest Law" said section reading:

"No person transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been caused by the gross negligence or wilful and wanton mis-conduct of the owner or operator of such motor vehicle and unless such gross negligence or wilful and wanton mis-conduct contributed to the injury, death or loss for which the action is brought. (Laws 1931, ch. 2, § 1; R.S. 1931, § 72-701)."

Before proceeding with an examination of the evidence, which it is proper for us to consider under the rule repeatedly announced and followed here in appellate practice, it is appropriate to again state the rule as follows: we

"must assume that the evidence in favor of the success-

ful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it." (Jacoby v. The Town of the City of Gillette, 62 Wyo. 487, 494; 174 P. (2d) 505).

See list of cases given where this rule has been referred to and applied though that list is, at the time of writing this opinion, not complete.

With this rule before us we find the evidence which we must consider in favor of the plaintiff to be in substance as follows:

MRS. BERNICE O. CULLEY: stated that she is the plaintiff in this action; that she is acquainted with William E. Meyer one of the defendants herein. That she first met Meyer in September 1949 when she was employed as hostess at the Trail Bar in Casper, Wyoming. She had been working from about the 15th September until the date of the accident in that employment. That between 15th September and the 24th October 1949 she went out with Mr. Meyer. Once to Denver, once to Worland and once to Newcastle. She did not know at that time that Mr. Meyer was a married man. When she asked him before she went with him if he was married he said "No, but what difference would it make?" She found out he was married when he brought his wife to the hospital after the accident. She had occasion to go out with Mr. Meyer in Casper where they ate together and she drove with him in his car around town. She had been with him most every place in town, between September 15th and October 24th 1949.

On the evening of October 24th 1949 she saw Mr. Meyer; he asked her to accompany him to Worland, Wyoming, on business; that she had gone there once before; his business was to check trucks working at the plant outside of Worland. It was at 7:30 or 8:00

P.M. when he came for her. When she went to the car with him, he had a bottle which was given to him by one Norman Andrews. Meyer had the bottle in the car when they started on the trip. The car was a 1949 Plymouth sedan. Meyer and Mrs. Culley left shortly after he, Meyer, came to get her, which was around 8:30 and it was dark. She and Meyer went toward Powder River west. As they went along in the car he and she were arguing about another fellow. That Mr. Meyer and she had had an argument once before and had quit going together, and she went out with this other fellow and Mr. Meyer came after her and that is what they were arguing about, i.e. about her having a date with some other man. Mr. Meyer's attitude toward Mrs. Culley after that argument was angry and he took a few drinks and started driving quite fast. She asked him to reduce his speed and he did not do it. He ran off the right side of the road twice; that Mrs. Culley asked him to let her drive and he refused to do that. When Mrs. Culley asked him to reduce his speed he replied that he wondered how fast the car would go. They were east of Powder River when Mrs. Culley asked to get out of the car. Meyer said he would let her out but he did not stop. She asked him again to stop at Powder River when they got there but he did not do so. That after they left Powder River he was still arguing and still driving too fast. He started driving around 50, she would say, and he kept seeing how much faster the car would go. She thought if she did not argue with him that he would quit, but he did not and he asked her how fast they were going. She read the speedometer to him and he would not slow down and when the car turned over Mrs. Culley had just read the speedometer and it said 87 miles per hour. Up to that time she had read the speedometer and it showed the speeds were increasing from 50 miles per hour on up to 87 miles per hour. She would not say that Meyer had travelled any

length of time at 87 miles per hour. Just preceding that he was travelling at 75 or 80 miles an hour. She does not recall whether it was west or east of Moneta where the accident took place. Somewhere between Powder River and Moneta Mrs. Culley asked him to let her drive and he refused. Up to that time he had taken a drink out of the bottle several times; she could not say how many. She took the bottle but did not take a drink from it. She said she just put it to her mouth but that she did not drink because she was afraid of the way he was driving and they were arguing. She read the speedometer on the car to Moneta from Powder River on up to the time of the accident. She could not say just how many times she read the speedometer to Meyer. That just immediately before the accident Meyer asked her how fast they were going and she said "87 miles an hour" and he hit the shoulder of the roadway and he pulled the wheel back and then pulled it again and then they turned over. That he hit the first time the right shoulder of the roadway; that they were travelling in a westerly direction. After hitting the shoulder on the right side the car went toward the middle of the road and back over the bank. There was no traffic at that point. That they did not meet a truck at that time. That she was not knocked unconscious; that she called to Meyer but he did not answer. That she called him again and he answered and said he could not move. That she said she would try to get up on the highway as she could see a car coming; that she was out of the car and that he was lying on the ground right beside her just a few feet apart. The car was on its wheels and facing the highway. They rolled over, she would say, approximately three times. She did not go out on the highway because she could not move; Meyer got up and came over and was going to help her up but she told him not to move her because she knew her back was broken and that her legs would not move. That he said she was all

right and she told him to go and break that bottle and to stop a car. That he stood her on her feet and she fainted. When she became conscious again she found she was in the north borrow pit. That after she had regained consciousness Meyer picked her up and carried her to the car and put the back of the front seat down and laid her across it. Then he flagged a car; that he found the liquor bottle and threw it away. That she was then taken to the hospital in an ambulance. At the hospital she was treated by Dr. Frederick H. Haigler. That she sustained injuries as follows: Her back was broken three times and pelvis four times and she had incurred internal injuries and injury to her right ankle. That after she was released from the hospital she was confined to her home. That at the time of the trial she had worked about a month and a half or two months at her employment. Before that time she was not able to work. She was not now able to work a full shift (at the time of the trial). At the present time she was employed at the Henning Hotel. She works three hours in the morning and is off from two o'clock until 5:30 p.m. and then works again. The day after the accident Meyer came to the hospital once of his own accord. That she asked him why he said "They met a truck" and he said, "Didn't we?" and Mrs. Culley told him "No" and he said that if they asked her what speed they were going to say 55 miles per hour the same as he had. That he asked her to tell that to the highway patrolman. She heard him tell the patrolman that before the ambulance got there. That he told the patrolman he was driving around 55 miles an hour. He then said that he had met a truck. At the hospital the next day she asked him why he said they had met a truck and he then said that he had blacked out for a minute. Mr. Meyer brought his wife to the hospital. That was the first time Mrs. Culley found out that he was married.

That she, Mrs. Culley, was 32 years old. The ambulance bill was in the sum of $42.50; the bill of Dr. Haigler for his services was for $425.00; that that bill has not been paid nor the ambulance bill. The bill of Natrona County Memorial Hospital was for $732.20. That bill was rendered to Mrs. Culley but it has not yet been paid.

She made a further request of Mr. Meyer to let her out of the car after they had passed Powder River. That she said to Meyer "Would you let me out at Shoshoni?" and he said "Yes" but they did not get there. That at the hospital Dr. Haigler put her in a cast which reached from just under her arms to her knees; a complete body cast. She was in the cast until December 15th from the 24th October, 1949. There was much pain in connection with Mrs. Culley's injuries. Mrs. Culley took sedatives for sleeping. When she was discharged from the hospital she still suffered pain and she was suffering pain at the time of the trial. She could not work because her pelvis pain bothered her and her back hurt her so badly she could not work a full shift and there was a lot of pain, which has existed since she left the hospital. She had a regular nurse at the hospital, not a special nurse.

On cross examination Mrs. Culley stated that she and Meyer started arguing two or three miles out of Casper beyond Mountain View. That Meyer drove fast after they had gotten five or ten miles out of Casper. That from then on Meyer was driving at an excessive rate of speed and drinking and engaging in argument. He did slow up for curves; that there was coke in the car. It was in the car when she went down there. That she saw one bottle of coke. They did not stop near Powder River at all. She took no drinks from that bottle at any time, she did say that she had had a couple of drinks before leaving the hotel with Mr. Meyer. Mr. Norman

Andrews was in Mrs. Culley's room at the time and he left by himself.

After the accident Mr. Meyer covered her with his jacket and then one of the cars that stopped by gave her blankets. Mr. Meyer told her he had found the bottle.

Mrs. Culley at the time of the trial was working at the Henning Hotel in the Coffee Shop having worked there approximately two months.

DR. FREDERICK H. HAIGLER: testified as a witness on behalf of the plaintiff that the accident was on the 24th of October 1949 and that he went to the place where the accident occurred near Moneta that evening. That he went in the ambulance; that when he arrived at the place of the accident she was in shock suffering intense pelvic pain, also suffering from exposure. He administered a hypodermic in order to facilitate moving her to an ambulance cot to take her to the hospital where he made an examination of her. The examination disclosed that she had a laceration through the right ankle involving the muscles and the rotating ligament, also the nerves to the foot. She had a laceration in the vaginal wall. She had a hematoma with hemorrhage in the uterus. She had a double fracture of the front and back side of the pelvic bone on the right. She had a double fracture of the pelvic bone on the left. She had a double fracture of the fifth lumbar vertebra, and also the second lumbar vertebra. She also had a urinary suppression due to trauma of the urinary bladder. Dr. Haigler meant by the word "trauma" the crushing force damaging the pelvic bones caused the outlet to the urinary bladder to stop. Other than that there were minor scratches and bruises. At the time the Doctor treated her for shock, supported the fractures, and after she was out of shock, several days later, he put her in a body cast from the knees to the shoulders. X-rays were

taken to determine the fractures and confirm them. In a cast of this description there is no movement of the body, the body is held rigid from the shoulders to the knees. He gave the ankle treatment to prevent infection; the nerve cannot be repaired. The effect of that injury will be some instability of the ankle and foot; one can stand on it but one is not always sure of the position; the coordination from the foot to the brain is not complete. The doctor knows of no way by which that condition can be corrected. She was in a cast approximately six weeks; during that time she experienced considerable pelvic pain and considerable pain in the ankle. He gave her morphine as needed to keep her resting. She was not able to sleep without opiates or sedatives; he released Mrs. Culley from the hospital the last of December. Dr. Haigler has seen the plaintiff at her residence and at his office periodically. That at the present time, i.e. the time of the trial, she has partial disability in the ankle and some stiffness of the lumbar spine, which is in the small of the back. Mrs. Culley has some pelvic discomfort and some irregularity in menstruation. The doctor thinks the ankle injury will be permanent and that there will always be some stiffness of the back and the pelvic condition is questionable. The doctor also thinks Mrs. Culley's back and ankle will continue to give her pain as partial permanent disability. His charges to the plaintiff for services in connection with this accident were $425.00; this being the usual and regular fee made by physicians and surgeons in Casper for the services rendered. He discussed his bill with Mr. Meyer and Mr. Meyer told him to take care of Mrs. Culley and see that she got along all right and he would pay the doctor. The doctor did not render Meyer a bill; he has never been paid as yet for his services.

The hospital bill in the amount of $732.20 is a proper charge for the services rendered, and the ambulance charge of $42.50 was fair and reasonable.

On cross-examination the same witness testified that it took him, Dr. Haigler, probably an hour and a half to go from Casper to the scene of the accident. The temperature was cold as it had been snowing but the highway was fairly dry.

The doctor also testified that Mrs. Culley still has some pain which varies with changes in temperature.

WILLIS ELLSWORTH: a patrolman with the Wyoming State Highway Patrol, was in the service of that organization on the 24th October 1949. He had been a patrolman prior to that approximately six months. He had before that a course six weeks' long in training as to the duties of a patrolman. From then on to October 24th 1949 he had occasion to examine accidents in the vicinity of this one. The accident occurred a mile east of Moneta on U.S. Highway No. 20. He was called to the place where the accident occurred. After he arrived it was approximately at 9:15 p.m. in the evening before the ambulance arrived. When he arrived he found the car damaged, sitting on its wheels facing the highway on the right side of the road; the north side. He found Mrs. Culley lying on the seats of the car and she was covered up, and of course, Mr. Meyer was also there. Ellsworth found the point where the car left the road. There was a slight bend to the left in the direction of the highway. There were not any skid marks at all on the oil mat according to his recollection. The shoulder of the highway, where the car had left the oil mat, was a little soft and the tracks of the car where it had left the oil mat and on the shoulder and the distance where it first left the oil mat to where the car was resting was 90 paces, approximately 270 feet, and from the tracks of the automobile after it left the road and hit in the borrow pit, could be seen every turn where the wheels hit. It turned over three complete times. There were no marks on the highway east of where it left the road.

The car was a total wreck. Ellsworth could not state the exact speed the car was travelling. He would estimate the approximate speed of the car as in excess of 60 miles per hour and would say 70 to 75 miles per hour.

Cross-examination: There was a little snow in the borrow pit. The highway itself was dry. The slope was fairly precipitous from the shoulder of the road into the borrow pit. Ellsworth would say that when the car left the road it immediately began to turn over. When the car left the road of course it flew into space and when it hit, the car was turned a little bit sideways and it started to roll, and within the distance of possibly 200 feet, it rolled over three times, that is from the point he first hit the borrow pit. There were signs on the ground indicating where the car struck the earth. The car was off the earth part of the time between those markings found on the ground. The height of the car was about average; it rolled over sideways—not end over end. The width of the car is almost the same as its height. A car going 60 miles an hour, if it was out of control, and it started to roll, would do almost the same thing. His estimate of 70 or 75 miles per hour was based on the distance the car rolled and from the distance it flew into space after it left the highway before it hit the ground.

Ellsworth came to the conclusion the car was running 70 to 75 miles per hour and not 50 to 55. After examining so many accidents one could judge. He would not say exactly how fast the car was going because the speed varies with the terrain the car is on. The car rolled almost 100 yards after it left the highway. Before the car hit the ground it was approximately 15 or 18 feet. A car going at a reasonable speed after leaving the ground will come down faster. That varies according to the height the ground is from the place the car left the earth. To determine exactly you would have to fig-

ure it mathematically and would have to know the height and distance involved.

Ellsworth could not know the speed exactly as he had never ridden in a car at 70 to 75 miles an hour when it took off into space and rolled over three times. He measured the distance as 90 paces. These paces are approximately 36″. They could have been less than 36″.

WILLIS ELLSWORTH testified on REBUTTAL that his records show that he was notified that this accident occurred about 8:13 p.m. It took a little better than an hour to drive from Casper to the scene of the accident and it was about 9:10 or 9:20 p.m. when he arrived there. The oil mat on the road was dry. The shoulder of the road was damp and from where the grass began there was snow. The grass was about 1½ feet from the edge of the oil mat. The shoulder was a gravel one. The accident occurred as you go into the curve and took place as if, instead of making a turn, it started to go straight off the road, as if the road turned, and he went straight off as if he were going into the turn straight. There were marks on the shoulder of the road to indicate that course. As the car left the road the tracks indicated that Meyer was trying to make the turn and his tires left the bed of the road which threw gravel and had skidded along the shoulder. This is another indication of speed when he left the shoulder there was a slide. There was too much speed to keep traction.

Cross-examination: There were no skid marks on the black top surface of the highway. The car went for a certain distance over the embankment before it started to turn. That is, before it hit.

It was stipulated between the parties that on October 23rd 1949 the sun set at 5:07 p.m. This is what the weather man would have testified, if called.

Mrs. Culley was called for rebuttal and stated that

she and Meyer left Casper approximately 7:00 or 7:30 p.m. She could not say what time it was that Meyer came to her room at the Virginia Hotel that afternoon; but that they were there for quite a while before they left. Maybe an hour and a half or two hours. Mr. Andrews was there in the room and dressed. Mrs. Culley stated that she had her house coat on and she opened the door herself. Mr. Meyer took a drink in the room on Sunday afternoon. Mr. Meyer took down to the car the pint bottle which had been given him by Mr. Andrews. That Meyer always took liquor with him on his other trips. Meyer, when in the room, stated it was Sunday and he wished he knew where he could get a bottle. Mr. Andrews told him to take that one as it was full and it was on the dresser. The seal was not broken. Meyer offered to pay for it but Mr. Andrews said that was all right and it would not cost him anything.

Without dispute the defendant, Mr. Hopkins, testified that he lived in Denver; that he was Sales Manager for the Denver Oxygen Company and he also had a rental service company in Denver and Casper and rented trucks and welding machines. That Meyer, one of the defendants in this case, was one of his employees on the 23rd October 1949. That he, Hopkins, did not know the plaintiff, Mrs. Culley, never having seen her before until the morning of the opening of the trial. The Hopkins equipment goes to Worland, Billings, Montana, and all around wherever there is a call for it. Hopkins sends his equipment out and Meyer looks after it.

The testimony recited above as to the speed of the car when the accident happened, whether the parties had been drinking or not; whether Mrs. Culley asked to be let out of the car and whether Meyer refused to stop in order to let her out and other material points in the testimony of witnesses for the plaintiff were denied by testimony introduced by the defendants, but we must

not forget in this action that the rule in the Appellate Court applied by many decisions here as to conflicting testimony on review is as follows:

"Where testimony is conflicting, the finding of the trial court should not be disturbed, unless such finding is clearly erroneous or against the great weight of evidence." Williams vs. Yocum, 37 Wyo. 432; 263 P. 607; Jackson vs. Mull, 6 Wyo. 55; 42 P. 603; Hester vs. Smith 5 Wyo. 291, 40 P. 310; Columbia etc., Co. vs. Duchess etc., Co., 13 Wyo. 244, 79 P. 385.

In the case of Christensen vs. McCann 41 Wyo. 101, 282 P. 1061 it was held in substance that where testimony was conflicting, but there was substantial evidence to support findings of the trial court, the reviewing court would not review the facts, even though, if it were hearing the case originally, it might feel inclined to come to a different conclusion.

From the foregoing testimony it is apparent that the defendant Meyer had been drinking liquor at least before the parties left Casper for Worland and he was also doing that during the time they were travelling towards the scene of the accident; that the plaintiff warned Meyer that he was driving too rapidly; that she asked him to let her drive the car but he refused to allow her to do so; that she repeatedly requested him to let her get out of the car, but he declined to stop it so that she could do so; that she reported to him the speed of the car as they drove westward; that the speedometer showed or disclosed that the speed of the automobile was consistently being increased until just before the accident when the car was travelling over 87 miles per hour.

While it is generally true that mere speed of itself does not constitute "wilful mis-conduct" yet there may be a point at which the speed became so excessive that the danger of injury to a guest was probable at such

extreme speed and that this might constitute "wilful mis-conduct." Needless to say the circumstances appearing in each case must rule this point. In Fisher vs. Zimmerman, 23 Cal. App. 696, 73 P. (2d) 1243 the automobile host in that case was travelling between 85 and 95 miles per hour when an approaching automobile was first seen a mile away on a hard surfaced road with dips and its paralleling shoulders soft. The host applied the brakes of the car and lost control of the automobile which overturned. The appellate court in affirming a new trial order in favor of the plaintiff where the verdict went in favor of the defendant, quoted from the earlier case of Hall & Mazzei 14 Cal. App. (2) 48, 57 P. (2d) 948, 950 (to be found at page 1246 of 73 P. (2d) which reads thus:

"We do not wish to be understood as holding that mere speed may never constitute willful misconduct if indulged in under certain conditions. Willful misconduct, like negligence, must relate to the time, place, person and surrounding circumstances, and must be measured by them. Excessive speed under some circumstances may amount to negligence, under others to gross negligence, and under still others to willful misconduct."

The California District Court of Appeals then said: "We believe that the evidence we have quoted would support a finding of willful misconduct if one had been made in the trial court. When the approaching automobile was first seen it was a mile away from defendant's car. At eighty-five miles an hour the automobile of defendant would have traveled the intervening mile in less than one minute had the other car been standing still. The speed of the approaching automobile appreciably reduced the time elapsing before the two cars came into contact. The condition of the oiled road with its dips and soft shoulders, coupled with the excessive speed at which defendant drove his automobile in the face of an approaching car, are circumstances which made injury to the passengers not an improbable result."

In the case at bar we find a number of circumstances

present which all taken together made such a case under the automobile guest statute as required the matter to be submitted to a jury as concerns the driver of the car, William E. Meyer. We are confirmed in this view when we examine the case of Swengil vs. Martin 125 Neb. 745, 252 N.W. 207, 208 and 209. The facts and Guest Statute of the State of Nebraska are summarized by the court thus:

"The defendant was driving fast between Elkhorn and railroad crossing, and on several occasions plaintiff told the defendant to slow down. He did slow down some for the railroad tracks and then speeded up again to from 50 to 55 miles an hour. Plaintiff then complained to defendant about his speed, and soon thereafter called his attention to the turn sign which is approximately 195 feet north of the center of the curve. Defendant, however, continued at that speed and made the turn at 55 miles an hour or faster, driving his car to the left of the highway and completely off the pavement into the dirt part of the road on the left of the curve, barely missing a telephone pole south of the pavement on the southwest end of the curve. He continued on the south side of the road toward the west at the same speed or faster. At the same time a Lincoln sedan, driven by B. F. White, was approaching the curve from the west on the south side of the highway at speed of 25 miles an hour. A head-on collision seemed unavoidable, and the Lincoln sedan turned northeast to get on the north side of the pavement. Defendant also turned north to get on the north side of the pavement, his right side of the street, and at a point 50 or 60 feet west of the corner, that is, west of the pole, the two cars came together in a V-shaped position a little north of the center of the pavement. The driver of the Lincoln car first saw defendant's car about 40 feet north of a culvert which is at the beginning of the curve. His car was then 120 feet or more west of the curve. The defendant saw the Lincoln car when 75 or 100 feet away from it. Plaintiff was seriously and permanently injured, and the cars were badly damaged.

"Plaintiff's right to recover in this action is limited by section 39-1129, Comp. St. Supp. 1931, which, in effect,

provides that the operator of a motor vehicle shall not be liable for any damages to any person riding in said motor vehicle as a guest and not for hire, unless such damages are caused by the gross negligence of the operator."

Construing this Statute the Court said:

"We are of the opinion that in adopting the guest act the legislature used the term 'gross negligence' as indicating a degree of negligence. Negligence may be slight, ordinary, or gross. Gross negligence means great or excessive negligence; that is negligence in a very high degree. It may be said that it indicates the absence of even slight care in the performance of a duty, and such, we think, is the meaning intended by the legislature." (Citing many cases).

The court, however, said quoting from the case of Morris v. Erskine 124 Neb. 754, 248 N.W. 96 that:

"The evidence adduced by plaintiff was such that it required submission to a jury for determination. Morris v. Erskine, supra, so fully answers defendant's contention that other language is inadequate. 'The existence of gross negligence must be determined from the facts and circumstances in each case. The question of gross negligence is for the jury, where the evidence relating thereto is conflicting and from which reasonable minds might draw different conclusions * * * What amounts to gross negligence in any given case must depend upon the facts and circumstances. What would amount to gross negligence under certain circumstances might, under different circumstances, be even slight negligence. Ordinarily, the question of negligence, whether slight or gross, is one of fact. If the evidence respecting it is in conflict and is such that ordinary minds might draw different conclusions therefrom, then a question of fact is presented for the jury to determine."

The appellate court concluded that the trial court did not commit error in overruling defendant's motion for a directed verdict, or in the giving of instructions on its own motion, or in the refusal of instructions requested by the defendant.

Under the evidence properly before us in this record it is reasonably clear that Mrs. Culley was not a guest of the owner of the car, Mr. Hopkins; Meyer alone extended the invitation which brought her into the Hopkins car. Hopkins as a witness for the defendant stated that he never saw the woman until the morning of the trial. Under such circumstances the following authorities would appear to be pertinent.

In 4 Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Edition (Part 1) it is stated: (p. 489)

"* * * if the driver, though acting duly for his master in the operation of the car is not acting for him in accepting and transporting the guest, the master cannot be held liable for his negligence in operating the car, resulting in injuries to the guest."

In La Bell v. Quasdorf 13 N. J. Miscl. 183, 177 A. 77, it was held that: an owner, permitting his daughter to use his automobile as his agent was not liable for injuries to the passenger plaintiff invited by his daughter where there was no evidence that the daughter had authority to take anyone into the father's car and made such person the invitee of the latter. Says the U.S. Circuit Court of Appeals for the 8th Circuit in Liggett & Myers Tobacco Co. v. De Parcq 66 F. (2d) 678, 685:

"An employee in possession of his employer's automobile has no implied or apparent authority to invite others to ride with him, and, if a passenger is injured by the negligence of an employee while riding in the employer's automobile pursuant to an invitation of the employee, the employer is not liable, for the reason that the passenger does not become a guest of the owner of the automobile." (Citing extended list of authorities.)

To the same effect is the cause of Garner v. Baker 214 Ala. 385, 108 So. 38, 39 where the court discussing this matter used the following language:

"And on the principle of respondeat superior, the owner of the car must be held liable to one riding therein as *his* guest, whether such owner is driving the car in person, or by his authorized agent or servant, with or without the presence of the owner in the car. See Powers v. Williamson, 66 So. 585, 189 Ala. 600. But, as held in that case, one who is riding as a guest in the car, though the car is being driven by the owner's agent or servant duly authorized thereto, may be the guest of the agent or servant, and not of the owner; and, if the driver, though acting duly for his master *in the operation of the car*, was not acting for him in accepting and transporting the guest, the master and owner could not be held liable. Powers v. Williamson, supra. Hence the fact that the driver of the car ,though operating it as the servant of the owner, invites a passenger to become his (the driver's) guest, does not *as to such* guest make the driver the servant of the owner in respect to the safe transportation of the guest." (Italics supplied by the Court.)

In Posey vs. Krogh 65 N. D. 490, 259 N.W. 757, 760, 761 it was held that it was not gross negligence per se, on the part of a daughter, to permit her brother to use her car in the service of her father. In the absence of any proof showing that the brother was habitually a reckless driver and that she knew this at the time she loaned the car, or showing other special circumstances. The statute of North Dakota, Chapter 184 of the Session Laws of 1931 says in section 1 among other things: "* * * and while so riding as such guest receives or sustains an injury, shall have no right of recovery against the owner or driver or person responsible for the operation of such vehicle."

Section 2 of the chapter aforesaid reads as follows:

" 'Nothing in this Act contained shall be construed as relieving the owner or driver or person responsible for the operation of a vehicle from liability for injury to * * * such guest proximately resulting from the * * * gross negligence of such owner, driver or person responsible for the operation of such vehicle.' "

Disposing of the case the Supreme Court of North Dakota said this:

"Reading chapter 184, it is clear that a guest has no cause of action against the owner of a car, nor the driver of the car, nor the person responsible for the operation of the car, merely because the guest is injured while riding in the car. Not only must the guest be riding in the car, but while such guest the damages must be caused by the gross negligence of the one he sues. If he sues the owner, he can recover only when he proves willful misconduct or gross negligence of the owner as the proximate cause of the injury, and the burden of proof is on the guest. Section 2, c. 184, Laws 1931. It is true the gross negligence of the driver may be imputed to the owner under certain conditions and thus become the gross negligence of the owner; but before the plaintiffs can recover against the owner in this case under the 'guest' statute, they must prove that the owner was guilty of gross negligence in permitting her brother to operate the car.

"There is no proof whatever of any gross negligence on the part of the defendant in allowing her brother to use her car for the purpose of going to Jamestown to get supplies for her father. It was a common practice and a reasonable thing. While there is proof of reckless driving on the part of the brother at the time of the accident, there is no proof that he was habitually a reckless driver, or that the defendant knew he was a reckless driver. There is nothing to impute gross negligence to the defendant. Hence there is no cause of action against the defendant in this case, and the actions are dismissed."

In White vs. Brainerd Service Motor Co., 181 Minn. 366, 232 N.W. 626, 627, it was held that a servant whose mission it was to drive an automobile to employer's sales office 150 miles distance, as a matter of law had no authority to invite others to ride with him. Accordingly, it was determined that an employer was not liable for injuries to persons whom the servant, without authority, had invited to ride with him. The Su-

preme Court of Minnesota in this case pointedly remarked that:

"There is no good reason apparent to us for holding that a jury may be allowed to infer that a servant or chauffeur driving an automobile has ostensible or implied authority to invite or permit others to ride. It is not in the interest of the ordinary automobile owner to give free rides to others and incur the risk incident to so doing. In this day of streets and highways overrun with motor vehicles operated so often at high and reckless speed, every owner of an automobile incurs a heavy risk when the car leaves the garage, and should not lightly be held to have authorized his servant or chauffeur to invite passengers for whose safety he as owner must also vouch. Here was no attempt to prove authority.

"This record repels the inference that these young men had any ground for the belief that Robert Anderson had either express or implied authority to invite them to take this long trip to Brainerd. They do not claim that they understood defendant to be in the transportation business, or that they were to pay for being carried. They were too intelligent to think that defendant, the owner of a valuable and powerful car, would consent to carry persons who were provided with intoxicating liquor to be drunk by the driver and occupants of the car, thus risking, not only damage to the car, but subjecting its owner to heavy loss should others be run into due to the driver's condition. By carrying liquor in the car they also must have known that the car was exposed to the risk of confiscation. Nor could they think that the driver had apparent authority to give them a 150-mile ride to further no interest of the owner. It is obvious that the interests to be served by the ride of these three men were only those of themselves and the driver. And so far as defendant was concerned, Robert Anderson's permitting their presence in the car was a clear departure from the scope of his special mission. To the argument advanced by plaintiff that defendant is liable, even though it had not consented to plaintiff's being carried, because the driver occupied a dual position, being the host to plaintiff and at the same time the agent of defendant engaged in driving the car pursuant to

orders, we quote the answer the court gave in Dearborn v. Fuller, 79 N. H. 217, 107 A. 607. There Freeman, the driver and servant of the defendant, was directed to drive the defendant's car from Boston to Manchester, and the servant invited Wallace, the plaintiff's intestate, to ride with him. The court said: 'In all that Freeman did touching the carriage of Wallace he acted outside the authority conferred upon him. From first to last it was his own undertaking and not that of the defendant. But it is said that, conceding this to be so, Freeman occupied a dual position. Personally, he was the host of Wallace, who rode as his guest, and as agent of the defendant he was engaged in driving the car from Boston to Manchester. Hence it is said the defendant through Freeman, knew of Wallace's presence and was bound to act reasonably towards him in the operation of the car. The defect in this reasoning is that when the agent acts in this dual way knowledge on his part is not chargeable to his principal.''

It follows from these authorities, as we think, that the trial court did not err in awarding a new trial to Hopkins, the owner of the vehicle in the case at bar. We observe that the defendant Meyer, it is urged by plaintiff in error, should have also been granted a new trial simply because the defendant Hopkins was granted one. This being the common law practice in the case of alleged joint tort-feasors, but it is indicated in the note in 143 A.L.R. 7, 15 that the "more enlightened tendency on the part of the courts" and the modern view of the matter, with some limitations not here pertinent results in holding generally that the grant by a trial court of a new trial or of a dismissal after verdict, as to one of several co-defendants who are sued together as joint tort-feasors and against whom a joint verdict has been returned, for errors peculiar to that defendant does not require a grant of a new trial, or in the case of dismissals after verdict as to one, does not prevent the entry of a judgment as against the other co-defendant. Cases from some 25 State appellate jurisdictions are cited in support of this view.

The old opinion (1892) in Albright vs. McTighe, 49 F. 817 rendered by the district judge in the Circuit Court for the western district of Tennessee, so much relied on by plaintiff in error, asserts also that upon the question discussed above in the preceding paragraph there is a conflict of authority and then says:

"* * * the older cases, and perhaps some modern ones, holding that one of several defendants in an action of tort cannot be awarded another trial unless all are. Bond v. Sparks, 12 Mod. 275; Parker v. Godin, 2 Strange 813; Doe de Dudgeon v. Martin 13 Mees. & W. 810, and note a; 2 Tidd, Pr. 911. The better doctrine is, however, otherwise, as the cases abundantly show; and while some of them endeavor to establish distinctions from the old rule, others boldly repudiate or ignore it altogether."

In 39 Am. Jur. 49 § 25 the text concurs with what is said in the note in 143 A.L.R. 7, 15 supra, as heretofore quoted, inasmuch as the compilers of that text assert: "While the common-law rule that a new trial as to some joint tort-feasors requires a new trial as to all appears still to be adhered to in a few jurisdictions, the decided trend of modern opinion does not permit the artificial and technical reasoning upon which this common-law rule is founded, to preclude the granting of new trial as to one of several joint tort-feasors, where furtherance of justice seems to require such action and the interests of the remaining defendants are not thereby prejudiced."

Without extending this opinion additionally it is our conclusion that while the judgment of the district court should be allowed to stand as against the defendant Meyer, it should be modified and should direct that a new trial be ordered as to the defendant Hopkins. As thus corrected the judgment should be affirmed when modified as directed.

*Affirmed when Modified as Directed.*

BLUME, C. J., and ILSLEY, J. concur.