ETHEL HAWKEY,

*Plaintiff and Respondent,*

vs.

JENNIE WILLIAMS, Executrix of the Estate of Nona
Williams, Deceased, and
JENNIE WILLIAMS,

*Defendants and Appellants.*

No. 2647; March 28th, 1955; 281 Pac. (2d) 447)

For the defendants and appellants the cause was submitted on the brief of H. Glenn Kinsley of Sheridan, Wyoming, and Burt Griggs of Buffalo, Wyoming, and oral argument by Mr. Griggs.

For the plaintiff and respondent, the cause was submitted upon the brief and also oral argument of Henry A. Burgess and Jack Wolfe, both of Sheridan, Wyoming.

## OPINION

RINER, Chief Justice.

This is the second appearance in this Court of this case. The first one was disposed of by the opinion here reported in 261 P.2d 48. The volume of the Wyoming Reports wherein the opinion should and will subsequently be forthcoming has as yet not been issued. The judgment of the District Court of Sheridan County as set forth in the opinion thus reported was that (261 P.2d) 48, 54) :

" 'Wherefore, it is hereby considered, ordered adjudged and decreed by the Court that Plaintiff's petition be, and the same hereby is, dismissed and judgment is rendered in favor of the Defendants and

against the Plaintiff for the cost of this action taxed at $8.25.' "

The pleadings of the parties and the facts and evidence shown by the record at that time are rather fully stated in the opinion aforesaid, and it will be unnecessary to report them here. The record then was viewed by us in the light of our decision in Boyle v. Mountford, 39 Wyo. 141, 147, 270 P. 537, 539. The opinion in the Boyle case was written by District Judge Brown and concurred in by Mr. Chief Justice Blume and Mr. Justice Kimball. The quoted language of the Boyle Case was approved in subsequent decisions of this Court; and it was pointed out in our first opinion herein that in the subsequent decisions of this Court, viz., Northwest States Utilities Co. v. Brouilette, 51 Wyo. 132, 65 P.2d 223, 69 P. 2d 623, Brown v. Wyoming Butane Gas Company, 66 Wyo. 67, 205 P.2d 116, Chandler v. Dugan, 70 Wyo. 439, 251 P.2d 580, the language of 64 C.J. 432, 433, § 426, was approved as follows (261 P.2d 48, 55) :

" 'By moving for a directed verdict, the maker of the motion admits the truth of whatever competent evidence the opposing party has introduced, and indeed, of all opposing evidence, or evidence on behalf or in favor of the adverse party, or facts stated in the evidence adduced, not only of all that the testimony proves, but of every material or ultimate fact which it tends to prove, in the slightest degree, together with all fair and reasonable inferences or conclusions of fact favorable to the adverse party, fairly or reasonably inferable or deducible therefrom by a jury.' "

See also 64 C.J. 382 to 385, § 377, 4 C.J. 762, § 2706, and 5 C.J.S. 338, § 1559.

Our examination of the record as it then stood resulted in a conclusion expressed in the following language, 261 P.2d 48, 68:

"It will be understood that what is said herein, is grounded upon the record now before us. If other mat-

ters should appear later which would materially change the factual situation then the trial court can very well mold properly the relief granted to meet the changed conditions.

"Our conclusion therefore is as already intimated that the judgment below should be reversed and the cause remanded with instructions to overrule the aforesaid motion to dismiss and for such further proceedings as the parties may desire to pursue and not inconsistent with the views herein expressed and as justice may require."

Accordingly, under the mandate of this Court, the cause was retried by the same judge before whom the record had been made as submitted on the first appeal herein. The evidence as there used plus additional evidence on behalf of both parties was again submitted on the second hearing in the District Court. The conclusion of that Court with the evidence of both parties then received and completed before it was contrary to what it had previously announced. A general finding with other special findings of fact was made in favor of the plaintiff and against the defendant, and a judgment together with costs in favor of the plaintiff and against the defendant was rendered. From this judgment, the defendant has appealed, and the evidence adduced by both parties is now before us for review.

Before proceeding further, we desire to call special attention to certain well established principles of appellate procedure which are so often overlooked or disregarded by litigants who bring cases to this Court and then experience disappointment at the results obtained here.

In the case of Christensen v. McCann et ux., 41 Wyo. 101, 106, 282 P. 1061, 1062, it was said:

"The evidence of the parties themselves and their witnesses was in many respects conflicting concerning the facts upon which the findings of the trial court relat-

ing to negligence were based, and hence under the familiar rule of appellate procedure, so often adverted to by this court, we can only look into the record to see if there is substantial evidence therein to support the findings of the court below. If there is, we cannot review the facts, even though, were we hearing the case originally, we might feel inclined to come to a conclusion different from that reached by the trial court."

See also Williams v. Yocum, 37 Wyo. 432, 263 P. 607, and cases cited, Meyer v. Culley, 69 Wyo. 285, 241 P.2d 87, and cases cited, and Benham Const. Co. v. Rentz, 69, Wyo. 176, 238 P.2d 927, and cases cited.

In Willis v. Willis, 48 Wyo. 403, 429, 49 P.2d 670, 678, it was announced that:

" * * * the appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsucessful party *in conflict therewith,* and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it. 4 C.J. 857. The arguments of counsel trying to show how unsubstantial is defendant's evidence are so many that, to keep this opinion within reasonable bounds, we cannot attempt to answer them one by one. And *it must be remembered that the credibility of witnesses was a matter for the trial court.* * * * (Italics supplied.)

In Jacoby v. Town of City of Gillette, 62 Wyo. 487, 510, 511, 174 P.2d 505, 514, and numerous cases there cited where appellants—as frequently is the case and is so in the instant case—come here with a general finding of the district court against them, we have repeatedly said:

"The appellants come here with a general finding of the trial court against them. Concerning the effect to be given such a finding, this court has said in Hinton v. Saul, 37 Wyo. 78, 259 P. 185, at page 191, that: 'And in causes tried to a court, a general finding is one of every special thing necessary to be found to sustain the judgment.'

"And in Wallis v. Nauman, 61 Wyo. 231, 238, 157 P.2d 285, 286, it was pointed out that in Knaggs v. Mastin, 9 Kan. 532, 533, the Supreme Court of Kansas in an opinion assented to by Mr. Justice Brewer said:

' "Where facts are established by a general finding of a court it must always be presumed that all the controverted facts are established in favor of the party for whom the court finds, and against the party against whom the court finds.' "

"See the Wallis case just cited also for other authorities on the same point."

Recalling as above mentioned that the trial court was the judge of the credibility of the witnesses in the instant case in addition to the testimony in evidence which has already been quite fully reviewed in the opinion heretofore filed, we now examine the evidence which was adduced on the second hearing of this matter and refer to some significant portions thereof appearing in the record made when the second hearing was had. It would seem that we have now an obvious case of serious conflicting evidence which was required to be resolved by the trial judge taking the two records together as must be done inasmuch as the plaintiff offered, and it was received without objection, "the entire Record on Appeal, Supreme Court Case No. 2585 and Sheridan County District Court Case No. 11165, consisting of all the original papers of this case and all the testimony and all the documentary evidence as shown from pages 1 through 126, together with the Mandate which was returned by the Supreme Court to the District Court under date of October 19, 1953." This set forth all evidence submitted then by the plaintiff only, as we have seen. Supplementing it, thereupon Jennie Williams, the defendant, was called to the witness stand by counsel for the plaintiff "for cross-examination under the statute." She testified in part as follows: Her name is Jennie Williams. She is the

defendant in this case, and also the executrix of the Last Will and Testament of Nona Williams, deceased. On the former hearing of this case, there was a discussion of a quit claim deed which was signed by Jennie and her sister, Ethel, wherein each deeded the one-third interest that each respectively had in their father's estate to their mother. In that deed it was recited that the consideration was one dollar and other valuable consideration. Jennie does not remember exactly what the quitclaim deed said. She does not remember that the one dollar was paid. There was no consideration for this deed by Jennie and Ethel to their mother other than the dollar. The approximate date of that deed was May 28, 1934. The petition for the probate of the father's estate was dated the same day as the deed signed by the two sisters to their mother. That petition was filed on the 31st day of May 1934 and subscribed and sworn to on the 28th day of May 1934. On or about that date their mother, Nona, may have made a will leaving all of the property equally to Jennie and Ethel. *Jennie has reason to believe that she did do so. She was in the habit of treating them exactly alike.* There was no promise, no consideration of that sort made. What Jennie thought it was and what was said have no relationship. "Q. Did you think you were going to share equally? A. That would be the natural supposition." If the property had all been given to Ethel, Jennie would not be the plaintiff in this case instead of the defendant. If Jennie had done what Ethel did—if Jennie refused to speak to her mother, or refused the children to visit her, and if Jennie had never visited during any of her illness, going by and not even offering to drive her car so that she could get to town, Jennie would certainly expect nothing. This witness is trying to say that Ethel mistreated her mother, Nona, for years, that there was no trouble as far as her mother was concerned. The mother always

treated Ethel as well as she possibly could. In the answer that Jennie filed in this case, she stated that when Jennie and her sister signed the assignment and quitclaim deed concerning their respective one-third interest in their father's estate to their mother, it was alleged that that was an absolute conveyance and intended as such. The quitclaim deed was absolute and intended as such. That was Jennie's understanding to date and was always her understanding. "Q. Then what did you mean when you wrote the letter to your sister and stated as follows: 'Dear Ethel, when did you decide that you had done the wrong thing in making it possible for Mama to have the use of the property for the rest of her life?'" Exhibit marked O-2 for identification is the letter which Jennie wrote to her sister on May 2, 1943. (The entire letter was received without objection pursuant to the ruling of this court.) "Q. Miss Williams, you stated in your previous testimony that you thoroughly understood that this deed to your mother was an out-and-out conveyance to her and a positive conveyance. How do you reconcile that statement with the first sentence in your letter, which reads as follows: 'when did you decide that you had done the wrong thing in making it possible for Mama to have the use of the property while she was alive?'" The witness replied it was entirely her intent to sign the quit claim deed, that Nona was to have the property. The witness continued: "Q. For life? A. *Well, she couldn't use it afterward.* Q. Well, I imagine that would be true. A. *Yes, I think it's true.* Q. And then down here you make this further statement: 'I doubt if you really believe that I have been drawing money from the estate all this time, although I know that you have given people this impression, but if you think it is true, you have no grounds for it and you should be put straight about it.' May I ask you this one question: would it make any difference if you drew it all unless

it was understood that you two children were to share equally? * * * * A. I don't see that there is any particular point in that. Q. In other words, there is no answer to the question except that it was understood that you were to share equally? A. No, I did not say that. I do not intend to convey that idea. There was no understanding that we would share equally when we made out that quit-claim deed. I want that understood clearly; that there was no agreement. Q. Now, at the time you wrote this letter it was May 2, 1943, is that not true? A. I believe so." Miss Williams' mother gave her the deed or deeds of all the real estate that had formerly been the property of her father in the summer of 1948. "Q. Why were they dated 1941? A. That was not any of my affair. I have no idea. * * * * * That was entirely my mother's property. She did what she pleased with it." She made no such statement as appears in her answer that her mother executed, made and delivered to her in 1941 the deed to all this property. They did not deliver it to Jennie until 1948. "Q. Did you know that she had deeded it to you prior to that time? A. I knew it before that. Q. You knew it when you wrote this letter, didn't you? A. I did not. Q. Then when you alleged in your Answer that your mother did make, execute and deliver that to you in 1941, you didn't mean what you swore to? A. That word 'delivered' should not be in there." The deeds were not delivered to Jennie. That is all she can state about the delivery of the deeds. Her mother gave the deeds to her in August of 1948. She recorded them when they were delivered to her. The monetary consideration for the deeds to all this property from her mother to her was that Jennie always sent home money all the while she was away from home with the exception of the years she worked in Denver as a secretary. Jennie did not put any revenue stamps on these deeds from her mother to herself. Jennie did not see plain-

tiff's exhibit number 9 until she saw it in the other hearing. Exhibit number 9 read as follows: *"February 21, 1938, Banner, Wyoming. Ethel: Today I have changed my will. You don't recognize me as a mother so why should you be remembered when I am gone.* I've stood it as long as I can. *Even trying to turn the children against me.* I have done nothing to be sorry for. Mamma" Jennie never saw that note. The deed from the mother to Miss Williams is set out in the answer. After Jennie gave up her position and came home to take care of her mother, she lived with her from that time forward. That was in the summer of 1943. The Eva Williams land was sold; and in 1943 the mother, Nona, purchased a tract of land consisting of a little over forty acres there on Piney Creek from the Woods. Jennie and her mother maintained a joint bank account both at the First National Bank and Bank of Commerce. All of the proceeds from the sale of any cattle or anything or rental would go into this joint bank account. Jennie and her mother had two joint bank accounts. At the date of the mother's death there was $578.84 in the First National Bank in the joint bank account; in the joint bank account in the Bank of Commerce, there was $2013.10. The death of the mother, Nona, occurred on March 19, 1951. The mother had no other cash to Jennie's knowledge.

We have italicized certain portions of the several witnesses' testimony in order to direct special attention thereto.

Ethel Hawkey, the plaintiff in this case, additionally testified in part as follows: "Q. Directing your attention to the 28th day of May, 1934, do you remember signing some papers in Mr. Kinsley's office on that day? A. I do. Q. And will you please tell the Court, Mrs. Hawkey, what documents you signed on that date? A. Well, I didn't know at the time what they were. Mr.

Kinsley informed me that they were simply to give my mother the use of the property as long as she lived. * * * * * Q. And did you understand at that time that your father's estate was to be kept intact, that is, for your mother's use during her lifetime? A. Yes. * * * * * Q. Did you understand at that time that you and your sister would share equally in this property upon your mother's death? A. I did. * * * * * Q. And later did you and your husband, Mr. Hawkey, go in to see Mr. Kinsley? A. We did. Q. And what did Mr. Kinsley tell you? A. Mr. Kinsley told us that we did not need to worry; that the property was divided equally between the two sisters. * * * * * Q. Then later did you see your mother? A. Yes, I did. Q. How long after seeing Mr. Kinsley did you see your mother? A. I would say it was 3 or 4 months. I don't know. I couldn't recall that exactly. * * * * * Q. Where did you see your mother? A. We went over to see her at her house. Q. Did she ask you to come over? A. She asked us to come over. * * * * * Q. And what did your mother say? A. Well, in the course of the conversation she said that I didn't need to worry at all; that the property was divided equally. Q. She told you you didn't need to worry about the fact that you had signed a quit-claim deed, then? A. Yes. * * * * * Q. But she did say that she was leaving the property equally to you two? A. Yes, to my sister and I. Q. And then that is the last; you didn't worry about it any more, is that correct? A. I didn't worry any more about it. I thought it was okay. Q. When did you first find out that your mother had left the property all to Jennie and left you $1.00? A. I went up to see Mr. Kinsley about 3 weeks after my mother's death. * * * * * Q. And at that time did you get a note that had been written by your mother? A. I did. It was sealed in an envelope. * * * * * Q. Why was it that you were worried when you found out that you had signed a quit-claim deed? A. Well, I thought

perhaps I had given up my title to half of the property." On cross-examination this witness said in part: "Q. Mrs. Hawkey, now referring to the papers which were signed in Mr. Kinsley's office on or about May 28, 1934, will you tell the Court who was present when those papers were signed? A. Mr. Kinsley, my mother Mrs. Nona Williams, Miss Jennie Williams and myself. Q. And what was the occasion for your going to Mr. Kinsley's office at that time? A. We were to go up there and sign some papers to give my mother the use of the property as long as she lived. Q. And you understood when you went there that that was what you were to do? A. Yes. Q. And understood at that time that you were to sign whatever papers might be required to turn the property over to your mother? A. I didn't realize that I was turning the property over to her. It wasn't explained to me. Q. Then why did you sign the papers if you didn't know what you were doing there? A. Mr. Kinsley told me that there was no need to read the papers and he told me the gist of what was in the papers. Q. Are you telling this Court that Mr. Kinsley permitted you to sign those papers without your reading them and without explaining to you? I certainly do. Q. And he never told you what was in those papers at all? A. He told me what he wanted to tell me; that they were for her use as long as she lived. * * * * * Q. Well, I am asking you whether you are positive because there is a lot dependent upon it, Mrs. Hawkey. Are you positive and do you swear to this court that at the time you signed these papers that Mr. Kinsley did not explain to you what they were and that he said to you that they were the papers for your mother's lifetime? A. That is right. * * * * * Q. Now, I think you testified that afterwards you consulted Mr. McNally and subsequent to that you went back to Mr. Kinsley's office? A. That is right. Q. Now, what did Mr. Kinsley tell you at that time with reference to this transaction? A. He

told us that we did not need to worry; that the property was divided equally. Q. And did he say at that time that there was a will? A. I don't remember that he said there was a will. * * * * * Q. Did your mother at any time tell you that she had made a will? A. No, she did not. * * * * * Q. Did you know, Mrs. Hawkey, that that deed had been filed for record some two and a half years before your mother's death?" (The deed from her mother to defendant, Jennie.) "A. No. * * * * * Q. And you had no personal knowledge whatever of any conveyance from your mother to Jennie Williams? A. No, I didn't. * * * * * Redirect Examination * * * * * Q. At the time you were in Mr. Kinsley's office, Mrs. Hawkey, did you understand in your own mind that you were executing papers to make it possible for your mother to have the property for the rest of her life and that upon her death you and your sister would share equally? Was that your understanding? A. Yes, it was. * * * * * Q. Now, soon after your mother took over the ranch, did your sister Jennie sort of exclude you from all the affiairs? * * * * * Q. Well, will you please tell the Court why you didn't have full information in regard to what transpired at the ranch after your father's death? A. Well, I was not consulted in any way whatsoever. Q. Did Jennie ever tell you anything? A. No. Q. And did your mother tell you anything? A. No."

On her own behalf, Jennie Williams testified in part: "Q. Do you know now whether or not your mother did make a will soon after your father's death, in which she left the property equally to you two girls? A. *I have every reason to believe that she did.* I never saw the will. Q. Did you know that she had made a will? A. *I thought that she had.* I could not swear to it that she had because I never saw the will.

H. Glenn Kinsley, Attorney for Nona Williams, the

mother, testified for the defendant in part: "Q. You found no record of the will in connection with the other papers made at the time of this quit-claim deed? A. No, but she did make a will later and *I'm sure that that will provided to leave the property to the two girls.* * * * * * Q. You heard Mrs. Hawkey testify to the effect that you advised her that this was simply a matter of conveyance for a lifetime? A. I heard her testimony. Q. Is that true? A. It is not true." To which answer counsel for plaintiff objected, saying: "The witness has already testified; and the record shows that Question 240 on page 77 he wouldn't say anything about the quit-claim deed; that 'I don't remember.'" Witness' answer was allowed to stand under the court's ruling.

Robert Miller testified in part on behalf of the defendant: "Q. Did you ever hear her" (Ethel) "say anything unkind about her mother? A. No. Q. Did you ever see her do anything that would cause her mother any discomfort? A. No."

Kathleen Hawkey testified for the plaintiff in rebuttal in part: "Q. What relationship are you to the plaintiff, Ethel Hawkey? A. She is my mother. Q. And you were born and raised out there on Piney? A. Yes. Q. And you knew your grandmother who was referred to as 'Aunt Nona'? A. Certainly. Q. Now, at any time during your entire life, did your mother ever tell you that you couldn't see Aunt Nona? A. No, she never did. Q. Tell the Court how often you did see her, how you treated her and how she treated you. A. Well, she always treated me fine. I didn't have any complaint against her. I tried to do all I could for her. I'd go over to drive her car several times and when she asked me to. And I helped her when she had a broken arm one time. I went over and helped her then. Q. And also tell the Court, did one of your brothers live with Nona for a number of years A. Yes. He's lived there, I think

ever since he got out of high school. Q. What year would that be A. He got out of high school in '39. Q. Which one of your brothers is that A. Harold. Q. You mean he actually lived over there with Nona all these years since he got out of high school A. Yes. Q. And did your mother ever object to him doing that A. No." Kathleen also testified on cross-examination that she was thirty years old. "Q. Now, did you at any time, at a later date, stop going to see your grandmother? A. I never stopped entirely going to see her, no. Q. Did you go to visit your grandmother at any time during the year that she died, or the previous years? A. Yes Q. How often? A. As I say, occasionally. I don't remember exactly. I was over there the day that she was taken sick, the worst, just before she died. Q. Did your mother call on your grandmother frequently during this period when their relations were strained? A. No, because my grandmother wouldn't speak to Mother. Q. When would you say that the relations between your mother and your grandmother became strained? A. Well, I can remember all during high school, after my brother went over there, Mother and I would be going down the street and we'd see Grandmaw on the street and she wouldn't speak to Mother. If Mother attempted to Grandmaw wouldn't talk back to her. Q. And you were present at those meetings? A. Yes. * * * * * Q. Do you know of any occasion, Miss Hawkey, when your mother told Harold that he'd be taken out of school if he talked with his grandmother? A. No, I don't know of any occasion. Q. Did he ever tell you that? No. Q. You never knew of anything of that kind? A. No. I didn't know of anything like that."

Leon Hawkey testified in rebuttal on oath on behalf of plaintiff: "You are the son of Mrs. Ethel Hawkey? A. That's right. Q. Mr. Hawkey, did you visit with your grandmother, known at 'Aunt Nona', during your

boyhood days? A. I sure did. * * * * * Q. Did your mother, at any time, ever tell you that you should not visit with her? A. No, she did not. Q. You were free to go see her at any time? A. Yes, sir. * * * * * Q. Did your grandmother send you Christmas cards and treat you as an ordinary grandmother would? A. Yes, she did." On cross-examination, Leon Hawkey testified: "Q. What is your age, Mr. Hawkey? A. 28."

It is very clearly apparent without reviewing more of the testimony given on the second hearing of this case that the evidence submitted by the parties was sharply contradictory and conflicting. When checked with what was given on behalf of the plaintiff and set out in the first opinion herein filed, the contradictory character of the testimony becomes more firmly established. Both by pleading and evidence, the defendant sought to establish that Ethel and her children had mistreated Nona, the mother of Ethel and the grandmother of the children. However, the children, Kathleen and Leon, who have since become of age, in their testimony dispute this view of the relations between Nona and the Hawkey family. Evidently the trial judge believed the plaintiff's evidence rather than that submitted by the defendant. This it was his province to do and doubtless accounts for the general finding he made on the facts in favor of the plaintiff and against the defendant. We cannot say there was "no substantial evidence" to support the trial court's findings.

Additionally, under the rule announced in the Willis and subsequent cases following that decision regarding plaintiff's evidence as true and laying aside that of the defendant, the same result is reached as when the contradictory evidence rule is invoked. We see no other course left open to us except to affirm the judgment of the District Court of Sheridan County before us under

review. Much more could be written in support of this conclusion, but there is no need to extend this opinion further.

*Affirmed.*

BLUME, J., AND HARNSBERGER, J., concur.