BROWN *v.* SAUCERMAN.

[No. 29,489. Filed November 21, 1957. Rehearing denied January 30, 1958.]

600

*Rabb Emison* and *Emison & Emison, of* Vincennes, for appellant.

*Ernest Tilly, Jr.,* of Bicknell, for appellee.

BOBBITT, J.—This case is here on transfer from the Appellate Court under Acts 1901, ch. 247, §15, p. 565, being §4-209, Burns' 1946 Replacement, four Judges failing to agree.

Appellee brought this action under Acts 1937, ch. 259, §1, p. 1229, being §47-1021, Burns' 1952 Replacement, to recover damages for the death of her daughter resulting from personal injuries sustained while a guest in an automobile driven by appellant.

Trial was by jury, which returned a verdict for appellee in the amount of $8,000.

Section 47-1021, *supra,* provides as follows:

"The owner, operator, or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest, while being transported without payment therefor, in or upon such motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the wanton or wilful misconduct of such operator, owner, or person responsible for the operation of such motor vehicle."

The determinative question here presented is whether the evidence, together with reasonable inferences which

may be drawn therefrom, is sufficient to establish wanton or wilful misconduct on the part of appellant.

The rule on wanton or wilful misconduct is concisely stated in *Becker* v. *Strater* (1947), 117 Ind. App. 504, at page 506, 72 N. E. 2d 580, as follows:

"Willful or wanton misconduct consists of the conscious and intentional doing of a wrongful act or omission of a duty, with reckless indifference to consequences, under circumstances which show that the doer has knowledge of existing conditions and that injury will probably result." Citing authorities.

The burden was upon appellee herein to show by a preponderance of the evidence that appellant was conscious of his conduct, ". . . and with knowledge of existing conditions that injury would probably result, and with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some duty which produced the injuries." *Bedwell* v. *DeBolt* (1943), 221 Ind. 600, 607, 50 N. E. 2d 875.

Acts of alleged wanton or wilful misconduct by appellant are charged in appellee's second amended complaint as follows:

"By driving at such unreasonably high rate of speed under the circumstances as to endanger the safety of others including the said Sue Ann Saucerman by driving said motor vehicle at from 75 to 80 miles per hour at a time when the roadway was wet and slick from rain and while rain was falling; while driving said automobile having tires with insufficient tread to properly control the operation of same so that said automobile could not be kept in defendant's right hand lane of traffic while approaching a curve to the right in the direction said defendant was traveling, which said curve could not be executed safely at said rate of speed under said circumstances.

"That as a result of the said wanton manner in which the defendant, Ronald Brown, drove said automobile he did then and there drive said automobile to the left of the center line of the roadway and into the path of a motor vehicle, to-wit: A Tractor-trailer approaching from the opposite direction while said Tractor-trailer was in its right-hand lane of traffic and the said two motor vehicles did then and there and as a result thereof collide."

Evidence on this point most favorable to appellee may be summarized as follows:

On the evening of June 13, 1953, appellant, another boy, the deceased and another girl drove to a "Drive-In" three-quarters of a mile south of Bicknell, Indiana, on State Road 67. They stayed about one hour, then left going south on Road 67 toward Vincennes, Indiana. It was dark and raining at the time.

An attendant at the Drive-In, a witness for appellee, testified, in pertinent part, as follows:

"Q. You were inside the Drive-In at that time?

"A. I was.

"Q. Tell the Court and Jury just what happened there, which way did they go and in what manner?

"A. When he left the Drive-In you make a little curve to go out to the pavement. The boy got in the car and when he started he went so fast up to the pavement that when he stopped it made the car slide sort of sideways and threw the gravel. He stopped long enough to look and see if anything was coming, I guess that's what he was doing, and he pulled out and the tires just squealed and made a loud noise and came in the direction of Vincennes. As we watched him, by the time he left our line of vision he was going at a terrific rate of speed.

"Q. About how far down the road towards Vincennes can you see a car after it leaves the Drive-In? You have any idea on that?

"A. I'd be afraid to say how far because I can't judge distance like that.

"Q. What is there on the other side of the road as you come towards Vincennes?

"A. The Sunshine Mine.

"Q. And tell the Court and Jury, in case they are not acquainted with that, where the Sunshine Mine is in relation to this Drive-In.

"A. As you come towards Vincennes the Drive-In is on the lefthand side of the road and I would say approximately one-half a mile toward Vincennes on the right side of the road is the Sunshine Mine.

"Q. Would you say that—where in relation to the Sunshine Mine did that car leave your vision?

"A. Well, it would be a little piece past the Sunshine Mine.

"Q. Towards Vincennes?

"A. Toward Vincennes.

"Q. And at that place when the car left your vision a little past the Sunshine Mine it was going at a high rate of speed?

"A. A terrific rate of speed.

. . . .

"Q. And what did you estimate the speed of that car to be?

"A. I'd say the boy was doing seventy—seventy-five or eighty miles an hour."

On cross-examination this witness again testified that it was more than one-half mile to the point where the car left her vision, and at that time it was traveling "real fast" and was going 75 or 80 miles per hour.[1]

---

1. The only evidence that appellant was driving 75 to 80 miles per hour was the testimony of an attendant at the Drive-In—who, looking through the window on a dark night, while it was raining, watched the car go down the road toward Vincennes and as it left her vision, at more than one-half mile away, it was going at a "terrific rate of speed," which she estimated at 75 to 80 miles per hour. The accident occurred more than two miles on down the road from this point, or about three miles from the Drive-In. This, in our opinion, is not substantial evidence and under the circumstances as shown by the record it can have no probative value.

A "curb-hop" at the Drive-In, also a witness for appellee, testified that appellant left there about 8 P.M., that he drove very fast, and that "He cut sharp to the right and as he stopped he just skidded and threw rocks back and it hit the building rocks threw back so far."; and, further, as follows:

"Q. Did you observe the car as it entered the highway?

"A. Yes, um hum.

"Q. Would you tell the Jury in what manner was that?

"A. He left at a very high rate of speed. He skidded on the highway as he pulled out.

"Q. Did you then observe the car as it went on down the highway?

"A. Yes, I did.

"Q. Which way did it go?

"A. It went toward Vincennes.

"Q. What speed, in relationship to slow or fast or medium, did it go down the highway toward Vincennes?

"A. It had to be going at a very high rate of speed because they were out of sight in just a matter of minutes."

The driver of the truck with which appellant collided testified that he was driving north of Vincennes on State Road 67, at about 8:30 P.M., and as he approached a curve on the crest of a hill he saw the lights of a car coming at "a fast rate of speed." He left the highway to avoid an accident but the car hit his truck about four feet across the center line, on his side of the road, knocking the left front wheel of the truck into the oil pan. It was dark and raining at the time and the pavement was slick. The truck traveled 15 to 20 feet after the impact and the car careened off to the other side of the road.

A state policeman, who arrived at the scene of the accident at about 9:05 P.M., testified that it had been raining and that the pavement was wet.

He further testified that he examined appellant's car the next day and found the front tires had very little tread but the rear tires did have some tread. He estimated the speed of the car from the damage done to be "better than sixty-five" miles per hour.

The rule by which we are guided in determining whether the evidence as above summarized is sufficient to sustain a charge of wanton or wilful misconduct under the guest statute is reaffirmed in *Miller, etc.* v. *Smith* (1955), 125 Ind. App. 293, at page 299, 124 N. E. 2d 874, 877, as follows:

" 'Because of the difficulty of defining with precision the terms used in guest statutes to describe . . . misconduct for which the owner or operator is liable, in determining whether particular conduct falls within such terms each case must be decided on the circumstances peculiar to it; every act or omission entering into the particular happening must be considered and weighed in connection with all the other circumstances, and in arriving at such decision the consequences of one's conduct as well as the conduct itself may be determining factors, . . . .' 60 C. J. S., Motor Vehicles, Sec. 399 (4) f. page 1007; *Sheets* v. *Stalcup, supra* [105 Ind. App. 66, 13 N. E. 2d 346]; *Pierce* v. *Clemens* (1943), 113 Ind. App. 65, 46 N. E. 2d 836."

Appellee asserts that the speed at which appellant was driving at the time of the accident was so excessive as to constitute wanton or wilful misconduct.

The question as to whether speed alone is sufficient to establish wanton or wilful misconduct is one of first impression in this State; but other States having similar guest statutes have held that excessive speed alone is not sufficient to prove wanton or

wilful misconduct. *Birmelin* v. *Gist* (1954), 162 Ohio St. 98, 120 N. E. 2d 711, 717; *Davis* v. *Hollowell* (1950), 326 Mich. 673, 40 N. W. 2d 641, 15 A. L. R. 2d 1160; *Meyer* v. *Culley* (1952), 69 Wyo. 285, 241 P. 2d 87; *Rodney* v. *Staman* (1952), 371 Pa. 1, 89 A. 2d 313, 32 A. L. R. 2d 976.

We adopt the rule as stated by the Wyoming Supreme Court in *Meyer* v. *Culley, supra,* at page 94 of 241 P. 2d:

> "While it is generally true that mere speed of itself does not constitute 'wilful mis-conduct' yet there may be a point at which the speed became so excessive that the danger of injury to a guest was probable at such extreme speed and that this might constitute 'wilful mis-conduct.' Needless to say the circumstances appearing in each case must rule this point."

Considering the circumstances surrounding the speed of the car in this case, if we assume that the jury believed the testimony of appellee's witnesses as to the speed of appellant's car at the time of impact, we find (1) that it was dark and raining; (2) that the pavement was slick; (3) that appellant had driven this stretch of road many times and was familiar with the topography and the curve in the road at the place of the accident; (4) that he was familiar with the car which he was driving; (5) that by the testimony of appellee's own witness, appellant, after being cautioned not to drive too fast when the car skidded as he pulled out onto the highway from the Drive-In, said, "Would forty or forty-five be too fast?"; and after that it didn't seem to her that they were driving that fast; (6) that the accident occurred at the entrance to a sharp curve on the crest of a hill where a car traveling in either direction could not see

another car approaching from the opposite direction until it was at the top of the hill and entering the curve; (7) that the accident happened about three miles from the Drive-In, inside of which appellee's witness (who testified that the appellant's car was traveling 75 or 80 miles per hour when it left her vision more than one-half mile down the road) was standing; and (8) that there is undisputed evidence that appellant was in the proper traffic lane until he was "blinded" by the lights of the truck as it came around the curve and over the crest of the hill. Considering all of the circumstances as they appear from the record, it does not conclusively appear that the speed at which appellant was traveling at the time of the accident was so "excessive that the danger of injury" to his guests was of such probability as to constitute "wanton or wilful misconduct" by appellant.

We recognize that "When one by a continuous course of conduct seems to exercise no concern for others he may be both wilful and wanton." *Kahan* v. *Wecksler* (1938), 104 Ind. App. 673, 678, 12 N. E. 2d 998, 1000.

However, there is no evidence in the record here that shows any "continuous course of conduct" by appellant from which any reasonable inference could be drawn that he had no concern for the safety of his companions who were riding with him in the car at the time of the accident.

It is also true that "acts such as exhibit a conscious indifference to consequences, make a case of constructive or legal wilfulness." *Bedwell* v. *DeBolt, supra* (1943), 221 Ind. 600, 607, 50 N. E. 2d 875.

However, we find nothing in this record which shows, or from which a reasonable inference could be drawn,

that appellant displayed a "conscious indifference to consequences" in the manner in which he was driving his car as it approached the curve on which the accident occurred.

There is no evidence to show, or from which a reasonable inference could be drawn, that appellant had knowledge that a truck was approaching from the other side of the hill, or that he realized that an injury would probably result from the speed at which he (appellant) was driving at the time he approached the curve where the accident occurred. We cannot presume that appellant intended to commit suicide or kill or injure his car companions by colliding with the truck. In fact, our presumption must be to the contrary. *Birmelin* v. *Gist, supra* (1954), 162 Ohio St. 98, 120 N. E. 2d 711, 718.

In order to sustain the verdict of the jury herein the burden was upon appellee to show more than a mere failure on the part of appellant to apprehend the danger of approaching the curve, where the accident occurred, at an excessive rate of speed under the circumstances. To have been guilty of wanton or wilful misconduct appellant must have intentionally proceeded into the curve with reckless indifference to the consequences, knowing that a condition existed from which, because of his conduct, an injury to his guests would probably result. *Bedwell* v. *DeBolt, supra* (1943), 221 Ind. 600, 606, 607, 50 N. E. 2d 875; *Hoesel* v. *Cain; Kahler* v. *Cain* (1944), 222 Ind. 330, 338, 53 N. E. 2d 165; *Swinney* v. *Roler* (1943), 113 Ind. App. 367, 47 N. E. 2d 846; *Becker* v. *Strater, supra* (1947), 117 Ind. App. 504, 506, 72 N. E. 2d 580. This appellee has failed to show.

Appellee also contends that to hold that the jury could not find from the evidence "that defendant drove

in a wanton and wilful manner would be to conclude that the jury had no right to consider the testimony of Appellee's witnesses and should consider only the testimony of Appellant himself and his friend, Richard Madding, . . . ."

The question which we must determine is not one of deciding what testimony the jury could consider, but rather the question with which we are confronted is: Did the evidence disclose a factual situation which constituted wanton or wilful misconduct by appellant in the operation of his automobile at the time of the accident herein? This question must be answered in the negative.

We recognize that this case presents a set of tragic and regrettable circumstances. However, it is fundamental that the plaintiff in a civil action must prove the allegations of his complaint by a preponderance of the evidence. If he should fail to prove any of the material allegations of his complaint, we cannot supply those missing elements for him. Our sole function here is to determine, by an examination of the evidence, whether it was sufficient to show the necessary elements of wanton or wilful misconduct on the part of appellant in the operation of his automobile at the time of the accident. In performing this function we must be guided by the well-established rules and principles of law. Applying these to the facts as disclosed by the record herein, it is our opinion that appellant is not guilty of wanton or wilful misconduct within the meaning of these terms as used in §47-1021, *supra,* and the trial court erred in overruling appellant's motion for a new trial. Hence, the judgment of the trial court must be reversed.

Other questions raised by appellant are not likely to recur in a new trial, hence it is not necessary to consider them.

Judgment reversed with instructions to grant appellant's motion for a new trial.

Landis, J., concurs in this opinion.

Achor, J., concurs in the result reached and dissents in part, with opinion, in which Emmert, J., concurs.

Arterburn, C. J., not participating.

## CONCURRING OPINION

ACHOR, J.—I concur in the result reached in the opinion written by Judge Bobbitt, but for a different reason. Contrary to that opinion, for reasons hereinafter set out at length, I am of the opinion that the evidence most favorable to appellee was sufficient to support a verdict and judgment based upon wanton or wilful misconduct. However, I concur in the result of that opinion because I believe that the court committed reversible error by admitting certain improper and prejudicial evidence over the objection of the appellant.

A brief statement regarding the nature of the action is necessary to an understanding of my reasoning in the case. Appellant brought this action under Acts 1937, ch. 259, §1, p. 1229 (being §47-1021, Burns' 1952 Repl.)[1] to recover damages for the death of her daughter, resulting from personal injuries sustained while a guest in an automobile driven by appellant. The com-

---

1. "The owner, operator, or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest, while being transported without payment therefor, in or upon such motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the wanton or wilful misconduct of such operator, owner, or person responsible for the operation of such motor vehicle."

plaint is predicated upon the alleged wanton or wilful misconduct of appellant. It alleges that appellant consciously and intentionally drove the car in which the decedent was a guest at a very high and dangerous rate of speed and upon the left side of the highway, in the nighttime in the rain, with smooth tires, on a slick, hilly and curving blacktop pavement, which conditions and the probability of injury from the conduct were known to appellant.

The error in the admission of evidence occurred in the following manner:

Appellee was asked whether she had any conversation with appellant on the subject of his speed, prior to the collision. Appellant objected to "this line of questioning as not tending to prove or disprove any fact in the case." The objection was overruled and the mother of the deceased daughter was permitted to testify:

"A.  He (Brown) and Dick Madding had come in on a Sunday afternoon at my house and they were sitting there and he talked about how fast he'd driven a motorcycle and then he said that he had come down in about twenty minutes from Vincennes, . . . ."

The appellant moved to strike out this statement for the reason previously given. This was also overruled by the court. Next, when questioned further about the conversation, appellee testified:

"A.  I told him to drive carefully because Sue Ann was all I had left and he said he would."

These statements were clearly calculated to prejudice the jury and were capable of having that effect beyond the ability of the court to repair the damage. They had no relationship to the accident and, although

appellee contends otherwise, they could not prove or disprove any fact in the case under any of the issues raised by the pleadings.

This action was filed and tried under two theories against two distinct parties. It alleged wanton or wilful misconduct against appellant. It also alleged negligence on the part of his parents under the theory that they consented to his use of their car, notwithstanding their knowledge that he had "a propensity for fast driving." The court directed a verdict for the defendant parents, who were thereby eliminated from the case. However, appellee asserts that the evidence above referred to was properly admitted as tending to prove (a) that appellant was driving at an excessive speed at the time of the collision herein referred to, and (b) that the defendant parents had knowledge of their son's "propensity for fast driving."

The admission of the evidence was clearly erroneous under either theory. The testimony regarding appellant's speed on a prior isolated occasion was incompetent to prove misconduct on the part of appellant on this subsequent occasion. Few rules of evidence are more firmly established than the rule that the acts of an individual in the past are not ordinarily competent to prove or disprove misconduct on the subsequent occasion of an accident. *Slade* v. *State* (1850), 2 Ind. 33; *Noah* v. *Angle* (1878), 63 Ind. 425. Evidence of previous acts of speeding, not to mention other prior accidents by a defendant, have never been admissible in Indiana to prove the liability of a driver of an automobile. Such issues would broaden a trial to an intolerable extent if the parties were permitted to go into all their prior driving activities and accidents, along with the determination of the fault and blame in each instance, casting aside the question of the relevancy and material-

ity of such evidence. The prejudicial character of the evidence is well settled. Wigmore on Evidence, Third Edition, Civil Party's Negligence, Vol. 1, §199, pp. 678-679, says:

" . . .

"The reason of Undue Prejudice, which applied to a defendant in a criminal case (ante, §194), has here a corresponding application, though a less dangerous one. The reason of Unfair Surprise is also applicable; for the party charged cannot even guess the time, place, and has no means of showing the testimony to be fabricated. The reason of Confusion of Issues also operates, for disputes over other carelessness would soon obscure the main issue. Add to this that a careless act or two may be done by the most prudent person, and that particular instances, unless repeated and emphatic, throw little light on the general disposition.

"For these reasons, almost all States exclude such evidence, whatever their views may be (ante, §65) as to the propriety of using the character, if otherwise evidenced, to show the probability or improbability of carelessness on a particular occasion.

"In issues as to negligent driving of *motorcars*, where this kind of evidence often has high probative value, it has in some jurisdictions been expressly made inadmissible by statute (post, §987)."

Likewise, it is stated in 61 C. J. S., *Motor Vehicles,* §515, at pages 245-246:

" . . . On the other hand, evidence that the driver of a motor vehicle is a competent or incompetent, careful or reckless, driver generally, as well as evidence of his negligence on other occasions, his involvement or lack of involvement in other accidents or collisions, his habitual carelessness, negligence, or caution, or his customary manner of driving, operating, or parking the vehicle is ordinarily not admissible."

For the reasons above stated the testimony above recited and objected to was not competent "to prove

any fact in the case" as it related to the action against appellant.

We next consider whether the above testimony was competent to prove liability on the part of the parents. In deciding this issue, we are not here required to consider the question as to whether a parent, who permits a son to drive an automobile knowing he "has a propensity for fast driving," can be held liable for injury occasioned by his son's driving at a fast speed.[2] However, if a situation were presented where such liability did exist, clearly the first requisite to liability would be the fact that the parent had *knowledge* of such propensity. Without *knowledge* of such propensity there could clearly be no liability. Here the conversation objected to was had by appellee and appellant out of the presence of the parents. Therefore, it could not "prove or disprove any fact in the case," as related to the liability of the parents. Therefore, I am of the opinion that the judgment must be reversed because of this error, in the admission of evidence.

However, I do not concur in the opinion as written by Judge Bobbitt for the reason that in my opinion the evidence most favorable to the appellee, together with inferences which may reasonably be drawn therefrom, is sufficient to sustain the verdict in this case. I am aware of the marked conflict in the evidence presented in this case. However, this being a court of appeals, we are permitted to examine only the evidence most favorable to the appellee, and to determine whether such evidence, together with reasonable inferences which may be drawn therefrom, is sufficient to establish

2. See: *Slade* v. *State* (1850), 2 Ind. 33; *Noah* v. *Angle* (1878), 63 Ind. 425; *Martin* v. *Lilly* (1919), 188 Ind. 139, 121 N. E. 443.

wanton or wilful misconduct on the part of appellant, as alleged.

A recital of the evidence most favorable to appellee follows:

On the evening of June 13, 1953, appellant, aged 16, accompanied by another boy, the deceased, and another girl, drove to a drive-in eating place three-quarters of a mile south of Bicknell, Indiana, on State Road 67. They stayed about an hour, then left, going south on State Road 67 toward Vincennes, Indiana. It was dark and raining at the time. Appellant was familiar with the highway. It was surfaced with blacktop and was wet and slick. It was hilly and curving. It was impossible to see over the hill and around the curve where the accident occurred. An attendant at the drive-in testified (with regard to the manner in which appellant operated his car) as follows:

"Q. You were inside the Drive-in at that time?

"A. I was.

"Q. Tell the Court and Jury just what happened there, which way did they go and in what manner?

"A. When they left the Drive-in you make a little curve to go out to the pavement. The boy got in the car and when he started he went so fast up to the pavement that when he stopped it made the car slide sort of sideways and threw the gravel. He stopped long enough to look and see if anything was coming, I guess that's what he was doing, and he pulled out and the tires just squealed and made a loud noise and came in the direction of Vincennes. As we watched him, by the time he left our line of vision (approximately one-half mile) he was going at a terrific rate of speed."

"Q. And what did you estimate the speed of that car to be?

"A. I'd say the boy was doing seventy—seventy-five or eighty miles an hour."

, Also, a "curb-hop" at the drive-in testified that appellant left there about 8:00 P. M., that he drove very fast; that "he cut sharp to the right and skidded and threw rocks back and hit the building, rocks threw so far."

After appellant skidded when he pulled onto the highway the occupants of the car talked with appellant "about driving too fast." A maximum speed of 40 to 45 miles an hour was discussed and said to be too fast."

The driver of the truck with which appellant collided testified that he was driving north of Vincennes on State Road 67, at about 8:30 P. M., and as he approached a curve on the crest of a hill he saw the lights of a car coming at "a fast rate of speed" on the left side of the road. He left the road to avoid an accident but the car hit his truck about four feet across the center line on his left side of the road, knocking the left front wheel of the tractor-trailer truck back into the oil pan.

A state police officer, who arrived at the scene of the accident, testified that he examined appellant's car and found the front tires had very little tread. He estimated the speed of the car from the damage done to be "better than 65 miles per hour." Pictures of the wrecked car were introduced in evidence and could have been considered as supporting this testimony before the jury.

At the outset, appellant asserts that his negligence, if any, was merely that of excessive speed and that speed alone is not sufficient to constitute wanton or wilful misconduct, within the meaning of the statute (§47-1021, *supra*). Although speed, in itself, does not ordinarily constitute wanton or wilful misconduct, it may, under certain circumstances, constitute such mis-

conduct.[3] Furthermore, the rule is well established that, in resolving the question of wanton or wilful misconduct, " ' . . . *every act or omission* entering into the particular happening *must be considered and weighed in connection with all the other circumstances,* and in arriving at such decision the *consequences of one's conduct* as well as the conduct itself may be determining factors, . . .' " 60 C. J. S., *Motor Vehicles,* §399(4) f., p. 1007, *Sheets* v. *Stalcup* (1938), 105 Ind. App. 66, 13 N. E. 2d 346; *Pierce* v. *Clemens* (1943), 113 Ind. App. 65, 46 N. E. 2d 836. (Our italics.)

Did the speed and manner in which appellant drove his car, under the circumstances, constitute wanton or wilful misconduct? In deciding this question, it seems appropriate that we begin our consideration with an understanding of the accepted meaning of the words "wanton or wilful misconduct" as they appear in the statute (§47-1021). At the outset, we note that the words "wanton *or* wilful" are used in the disjunctive. Therefore, in order that a driver of a vehicle be liable in damages to his guests, it is only necessary that his misconduct be *wanton.* Consequently, although his misconduct must be more than negligent or reckless, it need not be wilful, in that it is malicious, intentional, perverse or deliberate.

Webster's New International Dictionary defines *wanton* as follows: " . . . undisciplined; not susceptible to control; . . . Excessively merry or gay; sportive; frolicsome; . . . marked by or manifesting arrogant recklessness of justice, or the rights or feelings of others, . . ."

---

3. " . . . there may be a point at which the speed becomes so excessive that the danger of injury to a guest was probable at such extreme speed and that this may constitute 'wilful misconduct,' depending upon the circumstances in each case." *Meyer* v. *Culley,* 241 P. 2d 87, 94.

In determining whether the misconduct is merely *reckless* or whether it is *wanton*, it is significant that the definition characterizes wanton as manifesting "arrogant recklessness." Again, turning to Webster's Dictionary, we find the word "arrogant" defined as follows: "Making, or having the disposition to make, exorbitant claims of rank or estimation; giving oneself an undue degree of importance; presumptuously haughty. . . . Haughty implies consciousness. . . ."

In other words, accepting the above definition of the term "wanton," as applied to the misconduct of a driver in the operation of an automobile, it seems apparent that the driver of an automobile must do more than operate his car in a *negligent, unthinking* or *reckless* manner. For example, a "jackrabbit start" may merely be the sign of a "harebrained" driver who recklessly starts without thinking. To constitute wantonness, the driver must be conscious of his act and be impelled by some incentive or motive which is adverse to the safety or well being of his guests. It may be the desire of a youth merely to "show off" either his car or his prowess as a driver, or both. To be guilty of wanton misconduct within the meaning of the statute (§47-1021, *supra*), the driver must (1) be conscious of his misconduct; (2) be motivated by a desire to assert himself or his interests above or beyond, or in reckless indifference for, the safety of his guests, and (3) he must do so knowing that his conduct subjects them to a high probability of injury.

Wanton or wilful misconduct has otherwise been defined by our courts as follows:

"Willful or wanton misconduct consists of the conscious and intentional doing of a wrongful act or omission of a duty, with reckless indifference to consequences, under circumstances which show that the doer has knowledge of existing conditions

and that injury will probably result." *Becker* v. *Strater* (1947), 117 Ind. App. 504, 506, 72 N. E. 2d 580.

Having thus enunciated the criteria of wanton misconduct, we now consider the evidence as related to such criteria for the purpose of determining whether appellant was guilty of wanton misconduct.

First, was there evidence from which the jury might reasonably infer that appellant was conscious of his misconduct—namely, the speed at which he was driving? The evidence is that he drove away from the drive-in with such a start that he slid his tires and threw rocks onto the building when he left the drive-in. He "squealed" his tires and made a loud noise as he drove upon the highway. Thereafter the occupants of the car discussed the need for driving at a reduced speed because of the condition of the highway. Nevertheless, appellant accellerated the speed up to 70 or 80 miles per hour by the time he was a little over a half-mile from the drive-in. And he was driving in excess of 65 miles per hour at the point of collision, less than two and a half miles' distant. Had appellant merely driven at an excessive speed on a single instance, we would have been confronted with a different question. However, here appellant drove his car at an excessive speed on repeated successive occasions as described in evidence and after the necessity of driving at a reduced speed was openly discussed. Under these circumstances the jury could reasonably draw an inference that appellant was conscious of the fact of his excessive speed.

Second, was appellant's conduct merely the reckless and unthinking acts of a young inexperienced driver and therefore mere negligence or recklessness, or was his misconduct prompted by a conscious motivation or desire to "show off" and/or assert himself over and

above, or with reckless indifference to, the safety of his guests who entrusted themselves to his keeping? As stated above, here the jury had before it not merely a single wrongful act, but a series of acts and from these acts the jury could infer that appellant's conduct was impelled by the latter desire or motive.

Third, was appellant aware of the probable injurious consequences to his guests as a result of his conduct? He knew that it was dark and raining and that the pavement (blacktop) was slick. He was familiar with the highway and knew of the sharp curve at the crest of the hill where the collision occurred and that he could not see over and around it. He knew that it was a heavily traveled state highway and that the possibility of meeting oncoming traffic at the crest of every hill and at every curve presented a constant hazard. Considering the speed at which he was driving, the jury could reasonably infer that, under the above circumstances known to appellant, he was aware of the probability of injury to which he subjected his guests.

For the reasons above stated, I am of the opinion that the evidence was sufficient to present an issue of "wanton misconduct" to the jury. Therefore, its sufficiency became a jury question which, having been decided in favor of appellee, this court is not at liberty to disturb.

As stated in the case of *Miller* v. *Smith* (1955), 125 Ind. App. 293, 300, 124 N. E. 2d 874, 877:

" 'The question as to whether the accident was caused by the wanton or willful misconduct of the defendant should be left to the jury in all cases where there is any conflict in the evidence or *where different inferences from the testimony given might be reasonably drawn. . . .' Pierce* v. *Clemens, supra* (113 Ind. App. 65, 46 N. E. 2d 836.) (Emphasis supplied.)"

However, because the court erred in the admission of evidence, I am of the opinion that judgment must be reversed.

Emmert, J., concurs.

NOTE.—Reported in 145 N. E. 2d 898.