BARBEE *v.* WILLIAM E. FRICK, JR., BY NEXT FRIEND,
WILLIAM E. FRICK.

[No. 20,053. Filed March 18, 1965. Rehearing denied April 12, 1965.
Transfer denied May 5, 1966.]

44

*John E. Scott* and *Scott & Shine,* of Anderson, for appellant.

*Busby, Davisson, Cooper & Farr,* of Anderson, for appellee.

CARSON, J.—The appellee having heretofore filed a motion to affirm judgment, and the ruling on said motion having been withheld until this cause was finally and fully briefed and cause submitted on its merits, said motion is hereby overruled.

This appeal comes to us from the Madison Circuit Court and grows out of an action for damages filed by the appellee, William Frick Jr., by his next friend William Frick against the appellant William Frank Barbee.

The complaint alleged that the plaintiff-appellee was riding as a guest passenger in the automobile operated by the defendant-appellant at a time when it struck a bridge on Indiana Highway 132 which accident resulted in injuries to the plaintiff. The complaint charged that the injuries of the plaintiff-appellee were the proximate result of certain acts of wanton and wilful misconduct committed by the defendant. More specifically the complaint charged:

"Said defendant operated said automobile at an excessively high rate of speed, approximately 90 miles per hour, this being greater than reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing."

To the plaintiff's complaint the defendant-appellant filed an answer under rule 1-3 of the Supreme Court of Indiana. Trial was had by jury which returned a verdict for the plaintiff-appellee in the amount of $25,000.00 on which the court entered consistent judgment. The motion for new trial was timely filed and the overruling of the motion for new trial is assigned as the error for our consideration. In the argument portion of his brief the appellant contends that the allegations of the complaint were not proven by substantial evidence showing that the operator of the car consciously and with reckless indifference to the consequences proceeded with his method of driving knowing that if he did so injury to his passenger would probably result. In support of his argument the appellant generally applies several authorities which have been decided by this Court and our Supreme Court in cases dealing with wanton or wilful misconduct.

A careful study of the allegations of the plaintiff's complaint and the evidence adduced in support thereof clearly indicates that this case does not involve wilful misconduct but was tried on the theory of wanton misconduct. The general statements of the appellant are therefore not completely applicable to the case before us since wilful misconduct contemplates intentional recklessness or indifference and no such theory is involved in this case. In so far as the authorities which he cites turn on the proposition of wilful misconduct they are not applicable to the facts in this appeal.

Where the evidence is in conflict we will not weigh the evidence under an assignment that the verdict is not sustained by sufficient evidence. *Stidd* v. *Dietz* (1963), 135 Ind. App. 149, 192 N. E. 2d 651, *Norman* v. *Norman* (1961), 131 Ind. App. 67, 169 N. E. 2d 414. Under assignment, however, that the verdict is contrary to law it is our duty to examine the evidence together with all reasonable inferences which may be drawn therefrom, favorable to the appellee. We must then, after this examination, determine

whether or not reasonable minded men would have arrived at the same result. *Pelkey* v. *Strom* (1963), 135 Ind. App. 163, 187 N. E. 2d 753, *Gaut* v. *Gaut* (1963), 134 Ind. App. 317, 187 N. E. 2d 580.

Without burdening the record and unnecessarily lengthening this opinion we feel it wise to set out those portions of the evidence which we feel came within the above rule of law.

Direct examination of Harold Knickerbocker:

"Q. As you were proceeding that way, would you please tell the next time you saw this car?

A. Well, I glanced in the mirror and the first time I glanced in the mirror, I wasn't sure the car had started up. At that time, I suppose I was 600 or a thousand feet ahead of the car and the next time I glanced in the mirror, the car had started and seemed to be overtaking me quite fast.

Q. Did you continue to watch this car as it came up behind you in your rear view mirror?

A. Yes, I did.

Q. Would you please describe the way the car was driving at that time when you observed it?

A. Well, it was coming up quite fast. That's the reason it caught my attention and when the car was within range of two or three feet behind me, it pulled out on the opposite side of the road and was coming at a very fast rate of speed. I had mentioned it before the car got to me—that it was coming awful fast.

Q. Did this car then pass your automobile?

A. Yes, it did.

Q. At the time this car passed your car, how fast would you say that you were driving your car?

A. I was driving at approximately fifty miles an hour.

Q. After this car passed your car, then what did it do?

A. It proceeded on down the highway.

Q. Could you describe the manner in which it proceeded down the highway?

A. It was a normal passing with the exception of the high rate of speed, which caused me some concern.

Q. After the car had passed your car, did it continue then in front of you at a reasonable distance or what did it do?

A. Oh, well, it pulled away very rapidly.

Q. Could you give an estimate of the speed that this car was driving when it passed you and then went on out in front of you?

A. Well, I said at the time, that I would estimate it was driving somewhere around 75 or 80 miles an hour.

Q. Did the car, after it passed you,—what did it continue to do, if anything?

A. Well, it seemed that it continued to accelerate but it pulled away so fast that I couldn't tell. I know it didn't slow down any."

Direct examination of Marguerite Knickerbocker:

"Q. Will you tell when you next saw the car?

A. Well, we had passed it just slightly before and it came around us very fast and then pulled right on off down the road."

\*　\*　\*　\*

"Did the car stay in front of you?

A. No, it pulled away very fast and it went right down the road. We didn't see it very long after that.

Q. Do you know about how fast you were going?

A. I would judge around fifty miles. That's what my husband generally drives.

Q. Did this car stay in your view—the car that passed you?

A. Not very long."

Direct conditional examination of William Frank Barbee:

"Q. With regard to these events that I have been asking you about on Wednesday, July 19 and Tuesday, July 18, of 1961, is it that you don't have any specific recollection concerning events or is it that you have lost your memory because of something that has happened to you?

A. I think it is more or less—I don't think it is anything from the accident that caused me not to remember, I just don't recollect what I done.

Q. In other words you don't believe that your lack of recollection is due to anything that happened in the wreck or anything else that happened to you but it is rather you just specifically don't remember your activities on this particular day, is that right?

A. I think that is it."

Direct examination of William E. Frick, Jr.:

"Q. All during this time, who was driving?
A. Mr. Barbee.
Q. What is the next thing that you recall?
A. I don't recall too much after that. I remember that everything was going by awful fast—the telephone poles.
Q. What is the next thing that you remember?
A. I remember going over the dog leg in 132 and then the car—it felt like the car was raising up off the road and it felt like it slid off the right side of the road.

\* . \* . \* . \*

"Q. Billie, what did you say the next thing was that you felt?
A. That the car had turned half way around.
Q. Do you remember anything after that?
A. I was scared.
Q. What is the next thing you remember?
A. Waking up in the hospital."

\* . \* \* . \*

"Q. Do you recall anything in particular with reference to the operation of the car—speed of the car as you were going into the dog leg?
A. I know it was awful fast."

In the case of *Brown* v. *Saucerman* (1957), 237 Ind. 598, 145 N. E. 898, our Supreme Court had before it a case involving excessive speed, a dark night, slick pavement, tires with insufficient tread, and driving on the wrong side of the center line of the highway. With all of these factors before it the Supreme Court said at page 609:

"To have been guilty of wanton or wilful misconduct appellant must have intentionally proceeded into the curve with reckless indifference to the consequences, knowing that a condition existed from which, because of his conduct, an injury to his guests would probably result."

The Court further said on page 610:

". . . it is fundamental that the plaintiff in a civil action must prove the allegations of his complaint by a preponderance of the evidence."

The language of *Brown* v. *Saucerman,* supra, was affirmed by our Supreme Court in the case of *Clouse, etc.* v. *Peden* (1962), 243 Ind. 390, 186 N. E. 2d 1.

In the case of *Buroker* v. *Brown* (1960), 241 Ind. 421, 426, 172 N. E. 2d 849, the following statement is found:

"Furthermore, we note that appellant here erroneously assumes that the alleged prevailing opinion in the Saucerman case rests upon the assumption that at the time of the collision the appellant in that case was driving at a speed of from 70 to 80 miles per hour and that the excessive speed was the proximate cause of the collision. However, the evidence regarding speed as recited in the Saucerman case is limited to that of an officer who examined the car the next day and merely estimated the speed of the car from the damage done to be 'better than 65 miles per hour.' In fact, the alleged prevailing opinion upon which appellant relies specifically states that the testimony regarding a speed of 75 or 80 miles per hour was of no probative value.

In the Saucerman case the testimony regarded as of "no probative value" and discussed in the Buroker case is that given by a witness who was two miles away from the scene of the accident. As is stated in *Brown* v. *Saucerman,* supra, "This, in our opinion, is not substantial evidence and under the circumstances as shown by the record it can have no probative value." The Buroker case affirmed the lower court decision awarding the plaintiff damages but the evidence in that case was much stronger than that here presented. Although the award in that case was based primarily on excessive speed there was direct testimony that the appellee had observed the speedometer for several miles and that the appellant had driven at a sustained speed of 85 to 90 miles per hour until the accident occurred. We have no such substantial evidence before us in this case.

When we examine the evidence in the case before us we find that the Knickerbockers estimated the speed of the host car at the time it passed them as, "somewhere around 75 or 80 miles per hour." When passed by the automobile they were four or five miles from the scene of

the accident. There is no other direct evidence as to speed. From this evidence then the jury was expected to infer that the appellant's speed continued or increased up to the time of the accident and to further infer that the appellant consciously persisted in a course of conduct which he knew might result in injury to his guests. We think that under the rule set out by this Court in the case of *Burke* v. *Burke* (1963), 135 Ind. App. 235, 191 N. E. 2d 530, there was a lack of substantial evidence to sustain the verdict of the jury; that the verdict could only be sustained by predicating inferences upon inference. This we will not do.

When we apply the tests contained in the above cases we conclude that the verdict of the jury was contrary to law and this cause is therefore reversed with instructions to grant appellant's motion for new trial.

Judgment reversed with instructions.

Martin, J., concurs. Faulconer, C. J., concurs in result. Prime, J., dissents with opinion.

### DISSENTING OPINION

PRIME, J.—I dissent in this matter for the following reasons:

The appellee brought action against the appellant to recover damages for personal injuries sustained while riding with the appellant as a guest in his car. There were three other passengers in the car at the time of the accident. The accident resulted in serious and permanent injuries to the appellee, the appellant driver also was injured and the three passengers in the back seat were killed outright.

At the time of the accident, on July 20, 1961, the appellee was 13 years of age and the three boys riding in the back seat were all young boys 13, 15 and 14 years of age. The appellant who was driving the car was 22 years of age at the time. The facts further disclose that the appellant knew all

the boys well and had been their baseball coach and close adviser and friend for quite sometime.

On the day of the accident the appellant was the owner of a 1958 Chevrolet automobile. At about 2:00 P.M. of that day the appellant was driving his car in Lapel, Indiana. He met the appellee, Billy Frick, and asked him to take a ride with him. Billy got in the car in the front seat. They proceeded to the edge of town on Pendleton Avenue. Pendleton Avenue leads toward Pendleton, Indiana, and becomes State Road 132 outside Lapel. At the edge of town the appellant saw three boys riding bicycles and he stopped his car and asked these boys to ride in the car. They got in the back seat of the car, and then the car with the driver and the four boys in it proceeded out Road 132. Road 132 is a two lane blacktop road.

We now have testimony describing what happened:

*HAROLD KNICKERBOCKER, Direct Examination:* My name is Harold Knickerbocker, and I live at Rural Route 6, Box 300, Anderson. I am married, and have lived there for approximately four and one half years. My family consists of a wife and a daughter, fifteen. I am employed at Wolfe Floral and Garden Company on Road 32 between Anderson and Lapel.

Yes, on July 20, 1961, my family and I had occasion to be proceeding between Lapel and Pendleton and Road 132. We were considering purchasing some new furniture, and we were going to Pendleton to the furniture store. Yes, I was driving on that day and my wife and daughter were with me in a 1954 Plymouth stationwagon. It had a blue body with windows trimmed with creme and white, and the top was white.

Yes, we went through Lapel on 13 and then left Lapel on Road 132. It was sometime after lunch, I don't remember. We had eaten our dinner and I don't recall the exact time. Possibly between 1:00 and 2:00.

Yes, as I was going out on Road 132 between Lapel and Pendleton, as I was leaving the junction of 13 and 132, I noticed three boys pushing their bikes off the side of the road up under a couple of trees, and there was a car stopped along the road, off the road, on the highway. As he went by I slowed down and as I pulled out to pass the car, the three

boys had left their bikes under this tree and were proceeding to get into the car.

Yes, after I passed this car I proceeded toward Pendleton on 132. When I next saw this car I glanced in the mirror and I wasn't sure that the car had started up. At that time I suppose I was 600 or a thousand feet ahead of the car and the next time I glanced in the mirror the car had started and seemed to be overtaking me quite fast. Yes, I continued to watch this car as it came up behind me in my rear view mirror. It was coming up quite fast. This was the reason it caught my attention, and when the car was within range of two or three feet behind me it pulled out on the opposite side of the road and was coming at a very fast rate of speed. I had mentioned before the car got to me that it was coming awful fast.

Yes, this car passed my automobile. At that time I was driving approximately fifty miles per hour. After the car passed my car, it proceeded on down the highway. It was a normal passing with the exception of the speed, which caused me some concern. It pulled away very rapidly. I would estimate it was driving somewhere around seventy-five or eighty miles per hour. After it passed me, it continued to accelerate, but it pulled away so fast I couldn't tell. I know it didn't slow down any. The car remained in my view perhaps two minutes or a minute and a half, and then it went out of sight. It was a brown and creme 1958 Chevrolet.

Yes, I had an occasion to see this car a few moments later. It was in the creek down by the bridge where the accident occurred. The creek is commonly known as Foster's Branch Creek. No, I didn't recall anyone passing me on Road 132 going toward Pendleton after the 1958 Chevrolet passed me. I am not certain whether any vehicles passed me going toward Lapel after this car had passed my car. It seems as though I met some vehicle shortly after the Chevrolet passed me. Yes, at the time the vehicle that was going toward Lapel passed me, the 1958 Chevrolet was still in my view. I don't recall meeting any other vehicle going toward Lapel.

Yes, it is correct that the next time I saw this 1958 Chevrolet it was in the Foster's Branch Creek. I didn't see it as I pulled up to the bridge. My attention was attracted to the fact the car might be there because I saw some man running up the bank waving his arms. Yes, it is correct that I pulled off on the side of the road on seeing this. I pulled across the bridge, stopped my car, and started walking back

toward the bridge. (Witness's attention is directed to Plaintiff's Exhibit 1.) The car was approximately here in the creek, the back end facing back up this way at about this angle. Yes, I drove across the bridge and parked the car. Yes, I walked back toward the bridge, and as I peered over the bridge I saw the car. I walked on across the bridge over to this side (indicating on Plaintiff's Exhibit 1).

It is in the neighborhood of four or five miles between Lapel and Foster's Branch bridge. Yes, the car I saw down in Foster's Branch Creek was the car that passed me out on the road at the high rate of speed, and it was the same car I saw the boys getting in as I drove down near Lapel.

*MARGUERITE KNICKERBOCKER, Direct Examination:*
My name is Marguerite Knickerbocker. I live at Rural Route 6, Anderson, Indiana. I am the wife of the man who just testified.

Yes, I was in the righthand front seat of the car that proceeded from Lapel toward Pendleton on State Road 132 on July 20, 1961. My husband was driving the car and my daughter was in the back seat.

Yes, as we left the town of Lapel, I had occasion to see some bicycles. This was very close to the outskirts of Lapel, I don't know exactly where. There were the three boys putting their bicycles up and got in this other car. I saw two of them get in and the other was at the door, I believe. The color of the car was brown and creme. Our car passed that car and the next I saw it it came around us very fast and then pulled right on off down the road. Yes, I know definitely that this was the same car I had seen the boys getting into, and I definitely remember it going around us. It didn't stay in front of us, it pulled away very fast and it went off down the road. We didn't see it after that. I judge we were going around fifty miles per hour; that is what my husband generally drives. This car didn't stay in our view very long.

On that day I did have occasion to see the same car. When I next saw it, it was in the creek. (Record indicates that witness gestured on the survey, indicating where the car was at this point, and similarly indicating on the survey which way it was to Pendleton.) Yes, our car pulled across the bridge before it stopped and we got out of the car. Harold got out first and then I got out and followed him across the bridge and down to the boy who was lying there.

No, I didn't know Billy Frick at that time, and did not know them until they came into the courtroom. I had never met

them before. Yes, we stayed with Billy Frick because he was still alive and it seemed as though we might be able to help him. We tried to keep him quiet, and we did get a seat from the car and we tried to get him to lay on it a little bit to keep him from the stones there. They were quite hard and rough. I tried to get his name and I had to ask him three times. His name wasn't familiar to me and of course I was nervous too, but I did understand him the third time.

I would assume that we stayed in the neighborhood of the accident one-half hour. We did not continue on our trip to Pendleton. We went back home.

*MAX MANSHIP, Direct Examination:* My name is Max Manship. I am thirteen years old and live two and one-half miles out of Pendleton on the left side of Highhway 132 as you go toward Pendleton. I live there with my family— Mom, Dad, Sarah and Mary Jo. No, I have never been in court before.

Yes, I was acquainted with Frank Barbee prior to the 20th day of July, 1961. He worked on our farm before. Yes, I am acquainted with the Foster's Branch bridge. It is about one-half mile from our farm. I had occasion to go there on the 20th day of July, 1961. When I got there I saw a wreck with one automobile involved. I had seen the automobile earlier in the day. It was brownish gold and white. When I saw the car before the accident I was in the barnlot beside the gate, fixing my bike. This was about a half a car length from Highway 132. When I noticed this car it was flying past and it tooted or honked. It was moving fast.

*WILLIAM E. FRICK, JR., Direct Examination (Appellee-Plaintiff):* My name is Billy Frick and I live at 333 John Street, Lapel, with my mother, father and sisters. I am fifteen, and on July 20, 1961, I was thirteen.

I remember that about 2:00 on the afternoon of that day I was riding my bicycle in town, and I met Mr. Barbee, who asked me if I would like to take a ride in his car. I then put my bicycle in a person's yard and then got in the front seat on the righthand side of his car. I think the car was going south on Main Street in the direction of Pendleton Avenue and Road 132. After it got to Pendleton Avenue it turned left and went toward Pendleton. Pendleton Avenue later becomes Road 132.

The next thing I remember is that we stopped and Mr. Barbee asked three boys who were riding their bicycles if they would like to go with us. They said they would. They were

Ronnie McKay, age thirteen, Dennis McKay, age fifteen, and Norman Simpson, age fourteen. They got in the back seat of the car and I was still in the front seat. Mr. Barbee was driving, and we went on toward Pendleton.

I don't remember too much after that. I remember that everything was going by awful fast—the telephone poles. I next remember going over the dogleg on 132, and then it felt like the car was raising up off the road, and it felt like it slid off the right side of the road. I had a feeling that the car turned half way around in the road. I remember after that I was scared, and the next thing I remember was waking up in the hospital. I remember it was Saturday night when I regained consciousness, and it was Thursday that I was out on the road. I recollect nothing between those times. I recall that the car was being operated very fast, as we were going through this dogleg. I know that my friends in the back seat were killed.

I had known Mr. Barbee before. He was my baseball coach. He had just started coaching the baseball team that summer. Yes, he was the coach when the team started. We practiced once a week and we played a game once or twice. On these occasions Mr. Barbee was there. Yes, he was the adult in charge. He told us what to do when we played.

The first thing I remember when I regained consciousness in the hospital was that I was in pain and that the television was on. That is all. My left leg was in traction. Yes, it was later necessary for me to have an operation, and this was during the time I was still in the hospital.

"Q. Now, Billie, back on the road here, on the 20th, after you picked up the other boys—after the other boys got in the car, can you remember riding out there. I mean, from that time till the time you went over the dogleg or is that part a blank in your memory?

A. That part's a blank.

Q. You can't remember that part, is that right?

A. No."

Yes, I know the injuries I received. I had a compound skull fracture and my left ear lobe was cut off. I had a ruptured diaphram and a fractured hip. In the hospital I laid on a hard fracture bed for about a month, with my head down farther than my feet.

At first when I came home from the hospital I couldn't do anything. In about three weeks I could start to get out on

the side of the bed for a few seconds at first, and then about a week after that I got out in the chair for a few minutes. Yes, I was finally able to get out on crutches and eventually able to walk. Between the second and third operations I had trouble doing things I used to do. I couldn't do hardly anything. I couldn't sit right or bend over or lift things or run or play any sports I had played in. Before this happened I played basketball and ran track in school. I played Babe Ruth baseball and Little League. I couldn't do these things any more. I could shoot basketball, but that is all. No, I can't run after the ball.

Yes, I later had another operation and I still can't do very much after this last operation. I am not allowed to put my weight on it yet. I am doing a little exercises, and I have difficulty in sitting. It is very uncomfortable when I sit for a long time, and I can't put my shoes on. I can't dress myself or go to bed by myself at night or dress myself in the morning. My mother helps me get dressed.

*WILLIAM FRANK BARBEE (Appellant)*

The appellant testified that he had no recollection whatever of the accident or the events leading up to it.

At the conclusion of the testimony above and other testimony, the case went to the jury and a verdict was returned in favor of the appellee in the amount of $25,000.00.

We are thus confronted with one primary question:

Is the appellee's evidence and the inferences deductible therefrom sufficient to establish whether or not the appellant operated his automobile at the time of the accident *"in a wanton or wilful manner?"*

I have always been completely convinced that the legislature fully intended to leave the door ajar when the "guest statute" was passed in 1929. If the courts were to interpret this statute as closing the door completely to all persons riding as guests in automobiles we would be guilty of grievous error.

In the case at bar, where an adult person prevailed upon four young boys to ride with him and then, with complete absence of judgment or concern, proceeds to drive in a reckless and dangerous manner and in a posture which we can

only conclude as "show off," and carry three young teenagers to their death and permanently cripple a fourth, there is but one conclusion that can be reached in defining such a course of conduct. That would be to say without reservation or equivocation that the definition must be wanton misconduct.

I hasten to agree that speed alone may not be more than negligenec or recklessness, but excessive speed may, depending upon the attending circumstances, constitute wanton misconduct.

Here is a case where a grown man with a car load of 13 and 14 year old boys careened down a two lane blacktop highway at top speed for a distance of more than four miles until finally, with the car undoubtedly out of control, the fatal accident occurred. We do not know if any of the passengers asked the appellant to slow down or be careful. It may be supposed that perhaps none of the boys in the car made any outcry or asked the appellant to drive in a different manner. That is unknown in any event. Let us suppose for a moment that the passengers had been even younger in years. If they had been four or five years old, would the driver have owed more care? If a logical and fair minded answer would be in the affirmative then should not the same logic apply in this case?

Let us examine the latest cases in Indiana touching upon the interpretation of *wanton misconduct*.

I cite *Buroker* v. *Brown* (1961), 241 Ind. 421, 172 N. E. 2d 849.

The facts in the recent Supreme Court case of *Buroker* v. *Brown (Supra)* are extremely similar to those in the case at bar, and thus the similarities and few differences will be closely examined. The Supreme Court in *Buroker* v. *Brown (Supra)* held that the evidence before the jury was sufficient to sustain a verdict for the plaintiff based on wilful and wanton misconduct. A study of the case reveals that the only differences between that case and the case at bar is that it actually gives additional strength to the case at bar. Although

the Supreme Court held the evidence as presented in *Buroker* v. *Brown (Supra)* was sufficient and that the verdict for the plaintiff should not be disturbed, we submit that the evidence of wilful and wanton misconduct presented in the case at bar was of greater weight than in *Buroker* v. *Brown (Supra)*.

In *Buroker* v. *Brown (Supra)* the plaintiff suffered severe injury while riding in an automobile operated by the defendant. The jury returned a verdict for the plaintiff in the sum of $25,000.00 on the second paragraph of plaintiff's complaint which alleged wilful and wanton misconduct on the part of the driver. The driver appealed and the only error assigned or argued on appeal was that the verdict was not sustained by sufficient evidence. At the time of the accident the appellant was driving his car, a Chevrolet, on a paved state road and the plaintiff was riding with him in the front seat. The accident took place at 2:15 P.M. The evidence most favorable to the plaintiff showed that the defendant was driving at 85 to 90 miles per hour and continued to do so for over two miles. Upon entering a curve, the car went out of control, ran off the right hand side of the road, came back onto the road, slid, skidded or ran through the side ditch and road for over 500 feet, turned over and was completely demolished. There was no other automobile involved in the accident.

The facts thus far stated are not just similar to the case at bar, but demonstrate identical situations. The following facts were the same in both cases: (1) Both roads were hard surface state highways; (2) both accidents took place at the same time of day; (3) the approximate speed of the cars before and at the time of entering the curve was the same; (4) the accident which followed and the approximate course of skidding was the same; (5) there was only one car involved; (6) the amount of the verdicts was the same and (7) the alleged error argued on appeal was the same.

The following additional facts in *Buroker* v. *Brown (Supra)* are not identical to the facts presently before this court, but give additional strength to the case at bar. (1) The

defendant driver was not familiar with the road and (2) there was conflict regarding the speed of the car and the evidence of continuous excessive speed came from the plaintiff, an interested person. In the case at bar Mr. Barbee, the driver, testified he *was* completely familiar with the road and had driven it several times. Thus, he did not encounter the unexpected, but had full knowledge of the circumstances. The evidence of speed in the case at bar came from several disinterested persons as well as inferences from exhibits and there was absolutly no conflict. In fact, no one attempted to refute the evidence of extreme speed and all persons who testified were in agreement.

The 602 feet of continuous skid marks which were proven in the case at bar did not exist or were not described in *Buroker* v. *Brown (Supra)*. Also in the case at bar, the evdience of misconduct in the defendant's driving covered four and one half miles while in *Buroker* v. *Brown (Supra)* the evidence could only account for about one half this distance. These differences in the case at bar (the defendant's knowledge of the road, uncontradicted evidence of speed by disinterested persons, over 600 feet of continuous skid marks, and over four miles of driving at excessive speed) indicate the present case is much stronger than *Buroker* v. *Brown (Supra)*. As mentioned above our Supreme Court held there was sufficient evidence to support the verdict in favor of the plaintiff in *Buroker* v. *Brown (Supra)*. In finding the evidence sufficient to sustain the verdict in that case, the court stated on page 851,

"While it is generally true that mere speed of itself does not constitute 'wilful misconduct' yet there may be a point at which the speed becomes so excessive that the danger of injury to a guest was probable at such extreme speed, and that this might constitute 'wilful misconduct.' "

The Court adopted the following language on page 852:

"We recognize that when one by a continuous course of conduct seems to exercise no concern for others he may be both wilful and wanton. It is true that acts such as exhibit

a conscious indifference to consequences, make a case of constructive or legal wilfulness."

And also, the court states on page 852 of the opinion:

". . . . . we can not say as a matter of law that the speed at which the appellant was driving was not so extremely excessive under the attending circumstances; that injury to the occupants of the car was not a natural and probable consequence of appellant's intentional misconduct. In fact, such misconduct, if true, might reasonably have been considered as an invitation to catastrophe."

"We, therefore, conclude that the facts herein evidence, together with a reasonable inference which may be drawn therefrom, are sufficient to sustain the verdict."

I submit that the findings of the Supreme Court and the above quotations would also apply to the case at bar with facts so similar to *Buroker* v. *Brown (Supra)*.

I call attention to the case of *Clouse etc.* v. *Peden* (1962), 243 Ind. 390, 186 N. E. 2d 1.

There are many features concerning this case which can and should serve as a guide to this court in reaching a decision in the case now before the court. An examination of the facts in this case reveals that this was an action for injury brought by the plaintiff guest against the defendant host driver. The cause was submitted to trial by jury, but the trial court directed a verdict for the defendant. The plaintiff appealed from this decision of the trial court, and the Indiana Supreme Court reversed the judgment with instructions to sustain the appellant's motion for a new trial. The evidence before the court revealed that the defendant drove his automobile, beginning approximately one mile before the intersection where the accident occurred, at the rapid speed of 75 to 80 miles per hour, the defendant seeing how fast the car would run. These acts were done by the defendant on a gravel country road, approaching an intersection with no traffic control devices and with the view obstructed by cornfields adjoining the intersection. The evidence revealed that during the last mile of the drive in question, the plaintiff passenger

warned the defendant host of his dangerous conduct. Upon examination of this case by the Supreme Court, the court held that there was sufficient evidence before the court to warrant the question of wanton or wilful misconduct on the part of the defendant to be submitted to a jury.

There are several points discussed in the case of *Clouse etc.* v. *Peden (Supra)* which can and should serve as a guide for our use here. First, on page 4 of the court's opinion, the necessary elements to constitute wanton or wilful misconduct are defined as (1) the driver must be conscious of his misconduct, (2) be motivated by desire to assert himself or his interests above or beyond or reckless indifference for the safety of his guest, and (3) he must do so knowing that his conduct subjects them to a probability of injury. These tests are all met in the case at bar, as can be seen from examining the evidence discussed with reference to the previous cases cited. As previously pointed out, the court in *Bedwell* v. *De-Bolt* (1943), 221 Ind. 600, 50 N. E. 2d 875, 878, stated that knowledge of existing conditions on the part of the host is a consciousness of such conditions obtained through the exercise of his senses, or information obtained by warning through others. *Bedwell* v. *DeBolt (Supra)*, also explains it is not necessary to prove that the defendant deliberately intended to injure the plaintiff, it being sufficient if it is shown that indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequences of his act was injury to the plaintiff. The third element of the defendant knowing that his conduct subjects his guests to a probability of injury is also clearly obvious from the course of the conduct of the defendant in the case at bar. The court in *Clouse etc.* v. *Peden (Supra)* points out on page 4 of its opinion as follows:

"However, we can not limit the application of the Guest Statute to those circumstances where collision and injury are, in fact, more probable than improbable. Rather, the term 'probable injury,' as used in the cases defining wanton or wilful misconduct, must be considered to have reference

to situations where there is a very real and present likelihood of injury under the circumstances where the misconduct of the operator of the vehicle would be the proximate cause of the injury."

Certainly in the case at bar, one can only reasonably conclude that the defendant's actions were ones that had a very real and present likelihood of injury to the young boys riding with him.

Perhaps one of the most helpful points made clear by the case of *Clouse etc.* v. *Peden (Supra)* is found on page 5 of the court's opinion where the court states as follows:

"The question as to whether the accident was caused by the wanton or wilful misconduct of the defendant should be left to the jury in all cases where there is any conflict in the evidence or where different inferences from the testimony given might reasonably be drawn."

From the above quotation it is obvious that the law in Indiana as pronounced by this last Indiana Supreme Court case on the subject, makes the question of whether or not there was wanton or wilful misconduct by the defendant involved in a case, a matter for the jury to determine, where it is possible that the jury can infer from the testimony that such conduct did exist in the case. The appellee herein submits to this court that this pronouncement of law by the Indiana Supreme Court would support the submission of a case far weaker than the one at bar to a jury for decision. In the case now before us, it is most apparent and obvious that little of the facts necessary to support the verdict need be left to inferences, but rather the entire actions of the defendant and the course which his automobile followed over a period of five miles were brought to the jury through the witnesses who testified for the appellee. The little, if any, elements which are not completely known with reference to this tragic event can be supplied by logical inferences from the abundance of evidence available to the jury for consideration, particularly in view of the above

rule of law set forth in the case of *Clouse etc.* v. *Peden (Supra)*. In view of all these essential elements being present in the case at bar, as shown by the latest cases decided by the Indiana Supreme Court, I submit that the case now before the court should be in all things affirmed.

In appellant's brief from pages 101 to 104 we find a division designated Summary and Conclusion. Under this heading, appellant states that the appellee failed to prove

(1) Appellant was guilty of a continuous course of misconduct;

(2) He was guilty of any conscious misconduct.

These are the only questions raised by the appellant in his summary and conclusion, and apparently he bases his entire appeal upon them. A momentary glance at the evidence will disclose that both were definitely proven. Appellant was guilty of conscious misconduct (excessive speed for over four miles). Certainly excessive speed is misconduct and evidence introduced at the time of trial indicated the misconduct had continuously taken place from Lapel to Foster's Branch Bridge. Excessive speed during a shorter length of time was held to constitute a continuous course of misconduct in *Buroker* v. *Brown (Supra)*.

As to appellant's second contention, that appellant was not conscious of any misconduct, I would submit it is contrary to all human experience to suggest or suppose that the defendant could operate an automobile on a narrow two lane highway for about five miles at about 90 miles per hour during which time he passed at least one automobile, and yet not be conscious of his conduct. Mr. Knickerbocker described the defendant's method of passing his car as "normal" except for the extreme speed. This would have been impossible and the defendant could not have negotiated nearly five miles of highway at 90 miles per hour, had he not been fully conscious of his misconduct.

I firmly believe the evidence admitted at the time of trial and the reasonable inferences which can be drawn therefrom met all requirements of establishing the elements of wilful and wanton misconduct on the part of the appellant and particularly the two elements on which appellant relies which were set forth above.

As stated in the case of *Miller etc.* v. *Smith* (1955), 125 Ind. App. 293, 300, 124 N. E. 2d 874, 877, and as quoted in *Brown* v. *Saucerman* (1958), 237 Ind. 598, 621, 145 N. E. 2d 898.

"The question as to whether the accident was caused by the wanton or wilful misconduct of the defendant should be left to the jury in all cases where there is any conflict in the evidence or *where different inferences from the testimony given might be reasonably drawn . . . Pierce* v. *Clemens, Supra* (113 Ind. App. 65, 46 N. E. 2d 836). (Emphasis supplied)."

The jury in the trial court gave due consideration to all the facts and it is my opinion that there was more than sufficient evidence to go to the jury on the issue of wanton misconduct.

I do not believe this court should disturb the verdict of the jury on the question of evidence, especially evidence that was not refuted by anyone at any time.

The judgment of the trial court should be affirmed.

NOTE.—Reported in 205 N. E. 2d 180.